Dr. Allen GIDDENS, Plaintiff,

v.

The EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES, Defendant.

No. 1:02–CV–2094–RWS.

United States District Court, N.D. Georgia, Atlanta Division.

Nov. 1, 2004.

---

Kenneth L. Shigley, Shigley Law Firm, Atlanta, GA, for Plaintiff.

Michael Andrew Coval, Andrea K. Cataland, Carter & Ansley, Thomas Frank Richardson, Chambless Higdon & Carson, Macon, GA, for Defendants.

## ORDER

STORY, District Judge.

Now before the Court are Plaintiff's Motion for Partial Summary Judgment [41–1], Plaintiff's Motion for Leave of Court to Identify Economist and File Separate Motion for Summary Judgment on Calculation of Damages [45–1], Defendant's Motion for Summary Judgment [46–1], Consent Motion to Extend Time to Respond to Motions for Summary Judgment [52–1], Defendant's Motion *in Limine* to Exclude the Affidavit and Testimony of M. Patrice Webster, M.D. [62–1], Defendant's Motion *in Limine* to Exclude the Affidavit and Testimony of James R. Spivey, M.D. [63–1], and Plaintiff's Request for Leave to Supplement Record and Submit Supplemental Memorandum of Law [77–1].[1]

As a preliminary matter, the parties' Consent Motion to Extend Time to Respond to Motions for Summary Judgment [52–1] is **GRANTED nunc pro tunc.** Likewise, Plaintiff's Request for Leave to Supplement Record and Submit Supplemental Memorandum of Law is **GRANTED** [77–1].[2] The Court considers the remaining motions before it following its review of the entire record.

---

1. Also slated for the Court's consideration is the parties' Joint Consent Motion for HIPAA Qualified Protective Order [39–1]. The requested Order was entered by the Court on March 31, 2004 [40–1]. Accordingly, the Clerk is **DIRECTED** to remove the parties' Joint Consent Motion for HIPAA Qualified Protective Order [39–1] from the pending motions list.

2. The Court acknowledges that Equitable has not yet responded to this Motion. The evidence proffered by Dr. Giddens in his supplemental papers, however, does not affect this Court's resolution of the motions before it.

## Background

Plaintiff Allen Giddens ("Dr.Giddens") initiated this action in the Superior Court of Fulton County, Georgia, seeking to recover benefits under certain Disability Income Policies (the "Policies") issued by Defendant The Equitable Life Assurance Society of the United States ("Equitable"). Equitable removed the case to this Court based on diversity of citizenship in July of 2002.

### I. The Policies

The relevant Policies are consistent in defining "Total Disability" as follows:

TOTAL DISABILITY means your inability due to injury or sickness to engage in the substantial and material duties of your regular occupation. It will not be considered to exist for any time you are not under the regular care and attendance of a doctor.

(*See* Def.'s Mem. of Law in Supp. of Mot. for Summ. J. [46–1], Ex. 1.) The term, "your regular occupation," is in turn defined as "the occupation (or occupations, if more than one) in which you are regularly engaged for gain or profit at the time you become disabled." (*Id.*)

In addition to promising the payment of benefits during the pendency of any "totally disability" of the insured, the Policies contain a "Recurrent Disabilities" clause, which, as amended, states:

RECURRENT DISABILITIES. Successive periods of total disability or residual disability (if residual disability coverage is provided in this policy) will be considered one continuous period if: (1) they occur while this policy is in force; and (2) they result from the same or related causes; and (3) such periods are not separated by [twelve] months or more. Otherwise, they will be considered separate periods of disability.

(*Id.; see also* Aff. of Philip Verdi ¶ 9 (testifying that Policies were amended to ex-

pand recurrent period from six to twelve months).)

Under the terms of the Policies, written proof of any loss must be provided to Equitable at its home office within ninety days "of the end of the monthly period for which [it is] liable." (*Id.*) The Policies additionally contain a provision stating that "[n]o ... action may be brought after 3 years from the time written proof of loss is required to be given." (*Id.*)

### II. The Insured

Dr. Giddens graduated from dental school and became a licensed dentist in the State of Georgia in 1982. (Aff. of Allen Giddens ¶ 2.) After completing an internship with the Veterans Administration Hospital, he began operating a private dental office in Hawkinsville, Georgia in 1983. (*Id.*) He continued to practice general dentistry in that capacity until 1994, when he sold his practice to another dentist. (*Id.*) According to Dr. Giddens, it was his intention to open another dental office in Macon, Georgia in a building he had previously acquired. (*Id.*) Dr. Giddens testified that he fell ill in 1994, however, and that his health from that point forward did not permit him to open the practice as he had contemplated. (Aff. of Allen Giddens ¶ 6.)

Dr. Giddens cancelled his dental malpractice liability insurance coverage in 1994, shortly after he sold his Hawkinsville, Georgia office and ceased to engage in the active practice of dentistry. (*See* Dep. of Allen Giddens at 74.) Nevertheless, he remained a licensed dentist in good standing with the State of Georgia until December 31, 1999. (*See* Def.'s Resp. to Pl.'s Statement of Material Facts as to Which he Contends There is No Genuine Issue to be Tried [64–1] ¶ 21.) In addition, Dr. Giddens continued to subscribe to certain professional journals in

the field of dentistry, and at some point following the sale of his practice, applied for a position as a dentist with the State Merit System. (Dep. of Allen Giddens at 33–34, 52–56.) Furthermore, Dr. Giddens testified that he continues to perceive his primary profession as that of dentistry, and that it was his intention to open a dental office in Macon until the time he became disabled. (*Id.* at 51, 156–57.)[3]

According to Dr. Giddens, "the functional requirements and tasks" involved in the practice of dentistry include:

> stamina to do detailed work while standing and interacting closely with patients several hours per day; good hand coordination; ability to do precise and detailed work; good communication skills; ability to concentrate; examination of patients' teeth and mouth; analyze x-rays and evaluate dental needs; plan treatment and health promotion programs; treat teeth and tissue problems; keep records of the work done on patients; perform surgery, such as on gums or on supporting bones; extract teeth; make models for replacement teeth; take accurate measurements for new teeth; provide instruction on dental care; administer anesthetics to patients; write prescriptions for patients; use equipment and tools, such as drills or mouth mirrors; manage and hire staff,

supervise workers and office processes; and manage business and financial operation.

(Aff. of Allen Giddens ¶ 3.)

Concurrent with his practice of dentistry, and following the sale of his dental practice in 1993–94, Dr. Giddens also engaged in real estate development and investment. (*Id.* ¶ 4.) Although Dr. Giddens has come forward with testimony that, health permitting, his role in this enterprise occasionally involved physical components, the evidence of record shows that this endeavor was primarily administrative in nature, with the physical labor being performed by others. (*See* Def.'s Mem. of Law in Supp. of Mot. for Summ. J. at Exs. 7, 9 & 10.) Dr. Giddens has testified that, with his wife's assistance, he was able to engage in this undertaking until 1998, when his health prevented him from continuing. (*See* Aff. of Allen Giddens ¶ 4.)

According to Dr. Giddens, the "functional requirements and tasks for the occupation of construction management and real estate development" are as follows:

> entrepreneurial vision and energy; planning real estate projects; selection of house plans and materials; selection of contractors; supervision of construction superintendent(s); periodic inspection of contractors' work quality; financial man-

---

**3.** Many statements similar to those related above were made by Plaintiff's counsel in certain responsive papers now before the Court, but were not supported by any citation to the record. Rather, the testimony supporting these assertions was located by the Court only after a time-consuming judicial review of the sworn testimony before it. Counsel is admonished that it is not the function of this Court to uncover the evidence supporting his client's claims, and that all future papers filed with the Court should strictly comply with the mandates of this Court's local rules, including, *inter alia*, LR 56.1, NDGa. *See Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir.1998) ("The district court has dis-

cretion to go beyond the referenced portions of these [summary judgment] materials, but is not required to do so. If the rule were otherwise, the workload of the district courts would be insurmountable ...."); *see also Powers v. CSX Transp., Inc.*, 190 F.Supp.2d 1284, 1286 n. 2 (S.D.Ala.2002) (the court need not comb the record to determine the appropriate disposition of a motion for summary judgment). In all future filings, reference to facts counsel wishes the Court to consider should be followed by a clear and precise designation of where in the record testimony or documentary evidence is located.

agement of development and construction projects; supervise compliance with building and other regulatory codes; project scheduling; pay bills; pay contractors; work with banks, government agencies, and financial consultants as needed; calculating the feasibility of projects, reviewing sites, and planning for contingencies; and coordination dealings with realtors and agents.

(*Id.* ¶ 5; *see also* Lawrence Stewart Harris Dep. at 17–18.)

### III. The Insured's Claims and Condition

Dr. Giddens has submitted two claims to Equitable under the subject Policies. In the first, made in February of 1995, Dr. Giddens stated that he became disabled on June 7, 1994 due to "terrible pain in [his] left hip[.]" (Def.'s Mem. of Law in Supp. of Mot. for Summ. J., Ex. 11.) The accompanying Attending Physician's Statement, submitted by a Dr. James R. Robertson, diagnosed Dr. Giddens as suffering from "transient osteoporosis" and "a vascular necrosis," (*id.*), characterized as "the sum of the morphological changes indicative of cell death and caused by the progressive degradative action of enzymes" resulting from deficient blood supply. Dorland's Illustrated Medical Dictionary 1101 (27th ed.1988). Dr. Robertson opined that the condition dated back to a slipped capital femoral epiphysis Dr. Giddens encountered at the age of 12. (Def.'s Mem. of Law in Supp. of Mot. for Summ. J., Ex. 11.)

Following its receipt of this claim, Equitable requested certain information from Dr. Giddens in accordance with the Policies, including an occupational description, a progress report, the names of his treating physicians, and a statement explaining why the claim was submitted outside the thirty day window prescribed by the Policies. (Aff. of Philip Verdi ¶ 5.) Dr. Giddens did not respond to these requests, and in his own words, failed to "follow through" with his claim because he was optimistic regarding his condition and believed his hip was improving. (Def.'s Mem. of Law in Supp. of Mot. for Summ. J., Ex. 4.) According to Dr. Giddens, in the years following the submission of this first claim, his health "waxed and waned[.]" (Aff. of Allen Giddens ¶ 6.) Then, in October of 1998, Dr. Giddens began experiencing symptoms such as fatigue and abdominal pain. (Def.'s Mem. of Law in Supp. of Mot. for Summ. J., Ex. 14.) He sought treatment at the Mayo Clinic located in Jacksonville, Florida, where he was diagnosed with cryogenic cirrhosis, a condition of the liver, by a Dr. Rolland C. Dickson. (Def.'s Mem. of Law in Supp. of Mot. for Summ. J., Exs. 4 & 14.)

Following this diagnosis, in February of 1999, Dr. Giddens submitted his second claim for benefits to Equitable, stating that he was disabled and was on a waiting list for a liver transplant. (Def.'s Mem. of Law in Supp. of Mot. for Summ. J., Ex. 13.) In that submission, Dr. Giddens indicated that his occupations were that of a dentist and a real estate developer. (*Id.*)

Dr. Giddens underwent liver transplant surgery in May of 1999. (Dep. of Allen Giddens at 19, 51.) While his liver tests and renal functions subsequently returned to normal, (Def.'s Mem. of Law in Supp. of Mot. for Summ. J., Ex. 14), he nevertheless claims to be disabled and unable to work as either a dentist or as a real estate developer. Specifically, Dr. Giddens has testified that:

> Since my liver failure and liver transplant, I have been unable to perform most of the duties of either of my occupations, as a dentist or in residential real estate development. While I am not totally helpless, I am unable to resume either of these occupations, or any work of which I am aware approximat-

ing the same livelihood, in keeping with my background, circumstances, and physical and mental capabilities.

(Aff. of Allen Giddens ¶ 8.)

Dr. Giddens additionally procured the testimony of two treating physicians pertaining to his ostensible disability. The first is that of a Dr. James Richard Spivey, a gastroenterologist formerly employed by the Mayo Clinic who treated Dr. Giddens during his post-transplantation recovery. (Aff. of James Richard Spivey, M.D. ¶¶ 1–2.) Dr. Spivey testified that, based on his treatment of Dr. Giddens and his review of the latter's medical history, Dr. Giddens' liver failure was "caused primarily by an autoimmune disorder which was more likely than not associated with his history of ... hip pains" dating back to 1994–95. (Id. ¶ 3.) In addition, Dr. Spivey states that, notwithstanding Dr. Giddens' initially positive liver function following the implantation of the allograft, his patient continues to experience numerous adverse symptoms, including numbness of his fingers, hand tremors, gastrointestinal difficulties, chronic sleep disturbances and fatigue, anxiety, depression, and short-term memory loss. (Id. ¶ 4.) It is the opinion of Dr. Spivey that these symptoms are the product of both Dr. Giddens' underlying disorder and the effects of medications Dr. Giddens is required to take as a result of his disorder. (Id.)

Based on the foregoing observations and a review of the enumerated "functional requirements and tasks" of dentistry and real estate development discussed *supra,* Dr. Spivey offered his "professional opinion that [Dr. Giddens] is unable to perform substantial portions of the duties of" a dentist or real estate developer, "or any other employment known to [Dr. Spivey] approximating the same livelihood as [those professions], given his personal circumstances, including his experience, education, and physical and mental capabili-

ties." (Id. ¶¶ 5–8.) The second opinion, submitted by Dr. Mary Patrice Webster, Dr. Giddens' psychiatrist since 2000, essentially echoes the conclusions of Dr. Spivey. (See Aff. of Mary Patrice Webster, M.D. ¶¶ 4–7.)

Equitable has neither requested nor performed any independent medical evaluation of Dr. Giddens.

## IV. Equitable's Treatment of Dr. Giddens' 1999 Claim

Upon receiving Dr. Giddens' second claim for benefits, Equitable waived Dr. Giddens' premium obligations under the Policies, and began to pay benefits while it investigated his claims. (See Aff. of Philip Verdi ¶ 6.) However, following an in-house medical review in August of 2000, in which it concluded that there was "no current significant impairment that would preclude [Dr. Giddens] from performing most of the duties of his occupational description[,]" Equitable began making premium payments only pursuant to a reservation of rights. (Id.) In total, Equitable has disbursed $60,790.98 in benefits to Dr. Giddens under this reservation. (Id.)

A little over a year later, in September 2001, Equitable claims that it learned that Dr. Giddens had not actively been practicing dentistry for four years, and that his real estate occupation was essentially "passive" in nature. (See Def.'s Statement of Undisputed Material Facts ¶ 51.) After additional correspondence with Dr. Giddens, requesting that he "provide further clarification of this matter[,]" Equitable terminated the payment of benefits to Dr. Giddens in March of 2002. (See Aff. of Philip Verdi ¶ 7; Def.'s Mem. of Law in Supp. of Mot. for Summ. J., Ex. 14.) It claims to have based its termination of Dr. Giddens' benefits on two factors:

first, because plaintiff failed to show that he was regularly engaged in the dual

occupations of dentistry and real estate development when he allegedly became disabled; and second, because plaintiff failed to establish that he is unable, due to sickness or injury, to perform the substantial and material duties of the occupation in which he was actually engaged, namely, the occupation of a former dentist with a passive involvement in real estate.

(Def.'s Statement of Undisputed Material Facts ¶ 53.)

Dr. Giddens initiated the instant action in June of 2002, requesting that Equitable be held liable under the Policies for unpaid benefits, including with respect to his 1995 disability claim, his assertion of recurrent disabilities since 1995, and his 1999 disability claim. (Compl.) In addition, Dr. Giddens requested that the Court award him pre-judgment interest and enhanced damages for bad faith pursuant to O.C.G.A. § 33-4-6. (*Id.*) Equitable counterclaimed, seeking recovery of the $60,790.98 paid to Dr. Giddens under a reservation of rights. (*See* Answer & Countercl.)

### Discussion

### I. Defendant's Motions *in Limine*

■ Before turning to the parties' respective motions for summary judgment, the Court must first address Equitable's request that this Court not consider the affidavits and testimony of Dr. Spivey and Dr. Webster. According to Equitable, the expert opinions are inadmissible under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), for two reasons. First, Equitable argues that Dr. Giddens' treating physicians are not qualified to testify as to his disability, because they are not specially trained to render opinions regarding a patient's "disability status" under an insurance policy. Second, it urges that the physicians' reports are unreliable because they are predicated on the physicians' on-going treatment of Dr. Giddens, rather than on preferable, objective medical tests tailored to uncover the veracity of Dr. Giddens' claimed symptoms and his inability to work. The Court finds Equitable's arguments to lack merit.

Without reciting the dictates of *Daubert* and its progeny, the Court cannot hold that a treating physician is not qualified to give her opinion regarding a patient's inability to engage in certain activities, or that such opinion, developed through course of treatment, is insufficiently reliable to be admissible under the Federal Rules of Evidence.

■ The failure of a treating physician to conduct objective scientific tests to verify the existence of her patient's symptoms, like the absence of a physician's training in the field of disability insurance, may impact her credibility and the *weight* due her opinions, but will not render the opinion *inadmissible*. *See Seitzman v. Sun Life Assurance Co. of Canada*, 7 Fed.Appx. 89, 90, 2001 WL 327093, at *1 (unpublished opinion) (2d Cir.2001) (in disability insurance case, physician's reliance on patient's recitation of symptoms without objective testing impacted *credibility* of physician's opinion); *cf. also Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1159 (11th Cir. 2004) (in social security disability insurance case, failure of treating physician to conduct objective testing into patient's condition permitted ALJ to "discount" physician's testimony); *Cohen v. Lockwood*, No. 02-2246-JPO, 2004 WL 763961, at *3 (D.Kan. April 8, 2004) ("A treating physician often forms an opinion about the cause of an injury or the extent to which it will persist in the future based upon his examination of a patient. Courts therefore have allowed doctors to testify at trial concerning any medical opinions that they formed during the course of ... treatment with respect to [the patient's] injuries ...

and the extent of [the patient's] disability."). Indeed, a contrary holding would seem incongruent with the established rule in social security disability insurance cases that a treating physician's opinion must be afforded "substantial weight," and that the absence of objective laboratory tests only permits the relevance of such opinions to be "discounted." *See Ortega v. Chater,* 933 F.Supp. 1071, 1074–75 (S.D.Fla.1996).

Simply stated, the Court finds that, in the instant case, the purported deficiencies in the treating physicians' methodology impact only the *credibility* of their testimony, and not its admissibility under the Federal Rules of Evidence or *Daubert.* Equitable had the opportunity to proffer its own expert testimony explaining why the methodologies and/or conclusions of these physicians' were flawed, but it elected not to do so. While the Court certainly would have considered such contravening testimony in resolving the motions for summary judgment before it, it will not ignore the testimony of Dr. Giddens' treating physicians merely because they *could have* used superior methodologies to reach their respective determinations.

Equitable has cited only one decision to support a contrary result, the unpublished Order of this Court in *Hendry v. Equitable Life Assurance Society,* No. 1:99–CV–0485–RWS, slip op. (N.D.Ga. May 23, 2000). There, the Court held the opinion of a treating psychiatrist regarding his patient's psychological "disability" was inadmissible to support a bad faith claim brought by the patient against Equitable. *Id.* In that case, however, the psychiatrist admitted that he had no basis for testifying to the extent of his patient's ostensible

disability, and that his statement that his patient could not return to his prior occupation was "from the viewpoint of a treating physician interested in alleviating his patient's anxiety instead of a physician determining the extent, if any, of disability." *Id.* at 7.

Here, by contrast, Dr. Giddens' physicians plainly testified that their patient's symptoms, both physical and psychological, would preclude him from practicing dentistry or developing real estate, and based these opinions on extensive interaction with Dr. Giddens and a review of his medical history. (*See* Dep. of James Richard Spivey, M.D. at 49, 72–75, 78, 105–113; Aff. of James Richard Spivey, M.D. ¶¶ 5–8; Dep. of Mary Patrice Webster, M.D. at 47, 57, 61–65; Aff. of Mary Patrice Webster, M.D. ¶¶ 4–7.)[4] The Court finds neither to lack the indicia of reliability or qualification that could sustain a *Daubert* challenge. Accordingly, Defendant's Motion *in Limine* to Exclude the Affidavit and Testimony of M. Patrice Webster, M.D. [62–1] and Motion *in Limine* to Exclude the Affidavit and Testimony of James R. Spivey, M.D. [63–1] are **DENIED.**

## II. Defendant's Motion for Summary Judgment

Both parties to the instant action have filed motions for summary judgment. Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The court should view the evidence and any inferences that may be drawn in the light

---

4. The Court acknowledges those portions of the experts' deposition testimony where both appeared to respond affirmatively or equivocally to Equitable's counsel's suggestion that their opinions constituted "speculation" and "conjecture." Read in context, however, those statements appear only to concede that no objective, "laboratory" tests were performed to buttress the physicians' conclusions, not that the physicians' diagnoses and prognoses amounted to guesswork.

most favorable to the non-movant. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Equitable, in its Motion for Summary Judgment [46–1], contends that it is entitled to judgment as a matter of law on four aspects of Dr. Giddens' case. First, it seeks summary judgment on grounds that Dr. Giddens' 1995 claim is barred by certain procedural provisions of the relevant Policies, as well as the applicable statute of limitations. Second, Equitable requests judgment as a matter of law that Dr. Giddens is not entitled to recover benefits dating back to 1995 under a theory of "recurrent disability." Third, Equitable seeks summary judgment in its favor on the issue of liability arising out of Dr. Giddens' second claim for benefits, arguing that no evidence suggests that Dr. Giddens was unable to perform the duties of his "occupation" at the time he requested such benefits. Finally, Equitable argues that no evidence supports a finding of "bad faith" in its handling of Dr. Giddens' claims, and thus requests that summary judgment be entered in its favor on Dr. Giddens' O.C.G.A. § 33–4–6 cause of action. The Court considers these arguments in turn.

**5.** The parties appear to agree that Georgia law governs the substantive issues presented

## A. The 1995 Claim

Equitable argues that Dr. Giddens is not entitled to recover benefits in connection with his 1995 disability claim for several reasons. Among them are Dr. Giddens' failure to bring suit with respect to that claim until June of 2002. The Court agrees that this delay in initiating any legal action in connection with that claim precludes recovery of benefits for the alleged disability asserted therein.

Under the unambiguous terms of the Policies, written proof of any loss must be provided to Equitable at its home office within ninety days "of the end of the monthly period for which [it is] liable." (Def.'s Mem. of Law in Supp. of Mot. for Summ. J., Ex. 1.) Moreover, the Policies state that "[n]o ... action may be brought after 3 years from the time written proof of loss is required to be given." (*Id.*)

In his 1995 claim, Dr. Giddens claimed to have become disabled on June 7, 1994. (Def.'s Mem. of Law in Supp. of Mot. for Summ. J., Ex. 11.) Consequently, under the terms of the Policies, Dr. Giddens would have been required to submit proof of loss by no later than September 28, 1995. As a result, the "Legal Action" clause would purport to preclude any action brought after September 28, 1998—a date almost four years prior to when Dr. Giddens actually initiated this action.

 Under Georgia law,[5] contract provisions restricting the insured's right to bring suit within a specified period of time are generally enforceable. *See E. Tenn. Mortgage Co. v. United States Fid. & Guar. Co.*, 268 Ga. 536, 491 S.E.2d 333, 336–37 (1997). Although they may not be applied inflexibly to bar suit when the circumstances are such as to excuse a de-

in this case.

lay in performance, *id.,* no such circumstances were asserted here, and Equitable is entitled to enforcement of the time bar contained in the Policies as written.

■■■ Even if this were not the case, however, Dr. Giddens' lawsuit, insofar as it seeks recovery on the 1995 claim, would be foreclosed by the applicable statute of limitations. In Georgia, actions upon "simple contracts in writing" are required to be brought within six years after the cause of action accrues. O.C.G.A. § 9–3–24. This rule applies with equal force in the context of alleged breaches of an insurance contract. *Childs v. Armour Food Co.,* 175 Ga.App. 455, 333 S.E.2d 377, 377 (1985) ("Where a policy of insurance contains no limitation as to when suit thereon shall be filed, the period of limitation of action thereon is six years.") (*quoting Patrick v. Travelers' Ins. Co.,* 51 Ga.App. 253, 180 S.E. 141 (1935)). Dr. Giddens filed this lawsuit in June of 2002, more than seven years after he submitted his claim for benefits. Thus, his suit is untimely, both under the provisions of the Policies, and under O.C.G.A. § 9–3–24.

■■■ Dr. Giddens' only response in opposition to this result appears to be that he had a "reasonable expectation" that he would be able to collect disability benefits in the event that he became unable to work. While indeed a valuable tool to the insured in litigation, the "reasonable expectations doctrine" does not permit an insured nearly so great a latitude in his noncompliance with the provisions of a policy. To the contrary, it is well settled that the doctrine does not free an insured from unambiguous provisions of his insurance contract, such as those at issue here, *see Sapp v. State Farm Fire & Cas. Co.,* 226 Ga.App. 200, 486 S.E.2d 71, 73 (1997), and in any event, there can be no *reasonable* expectation on the part of the insured that a legal action initiated after the relevant statute of limitations has expired will entitle him to relief.

Accordingly, insofar as Equitable seeks summary judgment that Dr. Giddens in not entitled to recover disability benefits in connection with his 1995 claim, its Motion will be granted.

## B. The "Recurrent Disabilities" Theory

Equitable next argues that Dr. Giddens is not entitled to recover for any benefits allegedly accruing before 1998 on the theory of "recurrent disability."[6] Following its review of the record, the Court agrees.

■■■ The Policies permit an insured to recover benefits for successive periods of disability as one extended disability period provided that three conditions are satisfied. First, the periods of disability must "occur while this policy is in force;" second, "they [must] result from the same or related causes;" and third, "such periods [must] not [be] separated by [twelve] months or

---

**6.** As Equitable notes in its brief, Dr. Giddens appears to be seeking benefits under the Recurrent Disability clause of the Policies, although he never specifically makes reference to a "recurrent disability" in his Complaint. Rather, his pleading states only that:

All subsequent dealings with Equitable must be viewed in light of [Dr. Giddens'] initial claim in February 1995. From that day to this day, there has been a continuous progression of illness accompanied by a continuous progression of Equitable's conduct designed to confound and defeat Dr.

Giddens' legitimate claim. Dr. Giddens has been entitled all this time to disability coverage that he paid for, based on dental practice income in the two years prior to his illness averaging approximately $10,000 per month.

(Compl. § 10.) Despite this ambiguity, the Court will examine his "progression of illness" claim as one under the Recurrent Disability clause of the Policies; Dr. Giddens has not directed the Court to any other provision of his Policies that could conceivably sustain recovery for such benefits.

more." (Def.'s Mem. of Law in Supp. of Mot. for Summ. J., Ex. 1; *see also* Aff. of Philip Verdi ¶ 9.)

Here, Dr. Giddens did testify that his health generally "waxed and waned" between 1994 and 1998, (Aff. of Allen Giddens ¶ 6), and has adduced some evidence that his ailments were all likely the product of an autoimmune disorder. (Aff. of James Richard Spivey, M.D. ¶ 3). Nevertheless, he has not provided any evidence that he was actually *disabled* at any time between 1995 and 1998, or that any relevant periods of illness/incapacity were within twelve months of one another. To the contrary, Plaintiff had informed Equitable that his hip condition had significantly improved by June of 1996, and that he was able to function with only "limited pain." (Def.'s Mem. of Law in Supp. of Mot. for Summ. J., Ex. 4.) Moreover, when he went in for treatment related to his second claim in October of 1998—approximately twenty-eight months later—Dr. Giddens informed his physicians that he had been "previously healthy." (Def.'s Mem. of Law in Supp. of Mot. for Summ. J., Ex. 14; *see also* Def.'s Mem. of Law in Supp. of Mot. for Summ. J., Ex. 13.) These characteristics of Dr. Giddens' purported condition take him well outside of the Residual Disability provision of the Policies, which unambiguously require that the insured suffer (i) recurrent *disabilities* (ii) within a twelve month period. (Def.'s Mem. of Law in Supp. of Mot. for Summ. J., Ex. 1.)

7. In its Reply, Equitable also argues that, even if Dr. Giddens' occupation was considered to be that of a dentist or a real estate developer, he would not be "totally disabled" under the Policies. This argument, raised for the first time in reply, will not be considered by the Court. *See United States v. Ga. Dep't of Natural Res.*, 897 F.Supp. 1464, 1471 (N.D.Ga.1995) ("This court will not consider arguments raised for the first time in a reply brief.").

Indeed, Dr. Giddens does not seem to dispute his condition's literal failure to come within the terms of the Recurrent Disability clause of his Policies. Rather, he appears to once again rely on the "reasonable expectations doctrine" to insist upon the recovery disability benefits for times prior to October 1998. As stated earlier, however, the reasonable expectations doctrine cannot operate to "read out" of an insurance policy an otherwise unambiguous limitation on coverage. *Sapp*, 486 S.E.2d at 73. As a consequence, Dr. Giddens' inability to point to any pertinent ambiguity in the Policies' description of "Recurrent Disability," or any genuine issue of fact regarding the nonexistence of a "disability" between 1995 and 1998, precludes him from relying on the "reasonable expectations" doctrine to avoid the unequivocal contours of that concept under the Policies. Thus, to the extent Equitable seeks summary judgment on a theory of recurrent disability, its Motion will be granted.

## C. The 1999 Claim

Equitable next urges that Dr. Giddens is not entitled to recover disability benefits in connection with his February 1999 claim. In particular, it argues that Dr. Giddens' "occupation" at the onset of his October 1998 illness was that of a "former dentist with a passive involvement in real estate," and that there is no evidence in the record establishing Dr. Giddens' inability to perform the substantial duties of that "occupation."[7]

Even were this not the case, however, Equitable's argument would be unavailing. Equitable attacks Dr. Giddens' statement that he cannot perform "most" of the duties of a dentist and/or real estate developer as insufficient under the precedent of cases like *Cloer v. Life & Cas. Ins. Co. of Tenn.*, 222 Ga. 798, 152 S.E.2d 857 (1966), which states:

Mere inability of the insured to perform all or substantially all of the duties of his occupation or of such other line of endeavor as

After a review of applicable precedent and the record, the Court declines to grant Equitable summary judgment on this "occupational defense." Initially, the Court cannot accept, as a matter of law, Equitable's characterization of Dr. Giddens as a *"former* dentist."

As explained above, the Policies at issue define "Total Disability" as the insured's "inability due to injury or sickness to engage in the substantial and material duties of [his] *regular* occupation." (See Def.'s Mem. of Law in Supp. of Mot. for Summ. J., Ex. 1 (emphasis supplied).) The term, "regular occupation," is in turn defined as "the occupation (or occupations, if more than one) in which [the insured is] *regularly* engaged for gain or profit at the time [he] become[s] disabled." (*Id.* (emphasis supplied).)

■ Although the Georgia courts have not yet resolved the proper construction of the phrase "regular occupation," other courts to have considered the issue have consistently held that an insurance policy that refers to the insured's "regular occupation," without expressly requiring that the insured *actively* be engaged in that occupation at the time the alleged disability arises, does not foreclose the recovery of disability benefits simply because the insured is not so engaged at the time the subject injury or illness comes about. *See Amadeo v. Principal Mut. Life Ins. Co.,* 290 F.3d 1152, 1162–63 (9th Cir.2002) (holding that insurer's denial of a claim based on characterization of insured's occupation as that of unemployed person due to lack of work for two years prior to disability could sustain claim for bad faith); *Lehman v. Executive Cabinet Salary Continuance Plan,* 241 F.Supp.2d 845, 850 (S.D.Ohio 2003) (holding that only part-time employment immediately preceding disability did not preclude finding that insured was *regularly* employed as a full-time executive secretary); *Norcia v. Equitable Life Assurance Soc'y of the United States,* 80 F.Supp.2d 1047, 1053 (D.Ariz. 2000) (rejecting characterization of insured's "occupation" as that of a retired or unemployed person based on lack of employment immediately preceding disability); *Burriesci v. Paul Revere Life Ins. Co.,* 255 A.D.2d 993, 679 N.Y.S.2d 778, 779 (N.Y.App.Div.1998) ("The occupation in which plaintiff was 'regularly engaged' and to which she was attempting to return when she was injured was that of assistant administrator, and defendant may not deny benefits to plaintiff because she was temporarily unemployed at the onset of her disability."). The Court agrees with the reasoning expressed in these cases, and holds that the insured's "regular occupation," for purpose of the instant Policies, need not be one in which he was contemporaneously engaged at the time the dis-

he might be reasonably expected to follow ... would not amount to total disability, for he would not be totally disabled unless he was unable to perform any substantial part of the duties of such occupation or other line of endeavor as described.

152 S.E.2d at 858. At the outset, the Court notes that Dr. Giddens' declaration, though arguably inartfully worded, does not state that he can perform *any* substantial duties of dentistry, but rather, that he can *not* perform "most of the duties" of his occupations, without specifying whether the duties he can perform are substantial or not. Moreover, the expert testimony of Dr. Giddens' physicians provides evidence of those individuals "professional opinion[s] that [Dr. Giddens] is unable to perform substantial portions of the duties of" a dentist or real estate developer, "or any other employment known to [the physicians] approximating the same livelihood as [those professions], given his personal circumstances, including his experience, education, and physical and mental capabilities." (Aff. of James Richard Spivey, M.D. ¶¶ 5–8; Aff. of Mary Patrice Webster, M.D. ¶¶ 4–7.) Consequently, even if Equitable's argument had been timely raised, it would not entitle it to summary judgment in connection with Dr. Giddens' 1999 claim.

ability arose. Because Dr. Giddens had practiced dentistry for approximately twelve years prior to the onset of his alleged disability, a reasonable jury would certainly be entitled to conclude that dentistry was his "regular occupation" notwithstanding his failure to actively engage in such practice for some four years prior to the submission of his disability claim.

In reaching this result, the Court is not totally impervious to the concerns expressed in Equitable's papers regarding circumstances in which there exists a volitional break in pre-disability employment that is so substantial that the insured's former profession can no longer be considered his or her "*regular* occupation." The Court agrees that in such circumstances, concluding that the abandoned profession constituted the insured's "regular occupations" would render the qualifier "regular" meaningless. *See DiTommaso v. Union Cent. Life Ins. Co.*, Case No. 89–6323, 1991 WL 124601, at *3 (E.D.Pa.1991) (relying on Webster's Third New International Dictionary's definition of "regular" as "steady or uniform in course, practice, or occurrence," held that "one's regular occupation is the business, trade or profession that one engages in on a *usual* basis") (emphasis supplied).

Indeed, this conclusion is consistent with the outcome of the cases cited by Dr. Giddens in his papers. In particular, the cases cited above, while at times expressing their holdings in more sweeping terms, all dealt with situations where the unemployed insured either (i) had been rendered *unable* to work in their "regular occupation" in the months or years prior to the disability due to the disability itself, or (ii) had only very recently left their employment at the time the disability arose, with some manifest intention and effort to return to their "regular occupation" prior to the onset of the disability. Stated differently, none of the cases involved situa-

tions where the insured had voluntarily abandoned his or her occupation for an extended period of time and with no apparent intent to return to work in that capacity. In the latter scenario, this Court would have little difficulty concluding that the insured was no longer "*regularly* engaged" in the profession so abandoned at the time the alleged disability arose, and would construe insurance policies like those at issue here to exclude coverage predicated on an inability of the insured to work at that voluntarily abandoned enterprise. *Cf. Emerson v. Fireman's Fund, Am. Life Ins. Co.*, 524 F.Supp. 1262, 1267 (N.D.Ga.1981) ("As a general rule ... the occupation referred to [in a disability policy] is the occupation the insured was carrying on at the time he was injured. [Cit.] Thus, it is held that when an insured changes occupations, it is ... not [his occupation] at the time the policy went into effect that controls.").

Nevertheless, a genuine issue of material fact exists in this case as to whether Dr. Giddens voluntarily and permanently abandoned the practice of dentistry, or had instead only temporarily ceased to engage in such practice due to circumstances beyond his control. On the one hand, supporting the view of voluntary abandonment, there is evidence that the insured sold his Hawkinsville practice, had not practiced dentistry for over four years prior to his alleged October 1998 illness, canceled all malpractice insurance relating to dental practice in 1994, as well as the testimony of the purchaser of Dr. Giddens' Hawkinsville practice to the effect that Dr. Giddens sold his practice because he "wanted to branch out and do other things ... in the real estate development business in north Macon." (Dep. of Clarence Cheek, Jr. at 6.) On the other hand, there is evidence that Dr. Giddens continued to subscribe to dental journals, maintained his license to practice dentistry in Georgia,

applied for at least one job opening as a dentist following the sale of his practice, and harbored the intent to open a new dental practice in Macon up until the time of his liver failure.

Given the foregoing, conflicting evidence, the Court cannot find that dentistry was not, as a matter of law, Dr. Giddens' "regular occupation" at the time of his purported disability. This question alone precludes the entry of summary judgment in Equitable's favor regarding Dr. Giddens' 1999 claim.

Moreover, even were this not the case, there is ample evidence to support Dr. Giddens' involvement in the "occupation" of real estate development, and his inability to perform the substantial duties of that profession due to his current condition. Specifically, there is evidence in the record that Dr. Giddens owned two companies, Giddens Construction Company, Inc. and Oak Land & Development, Inc., through which he participated in the development of real estate through associations with various subcontractors, and through coordinating, *inter alia,* loans, zoning and utilities for the subject properties. (*See* Dep. of Randall Harrison at 16–21, 31–32; Dep. of Lawrence Stewart Harris at 17–18.) In addition, Dr. Giddens' physicians have testified that he is unable to perform the tasks associated with this occupation as a result of his illness and the side-effects of medications taken in connection with his illness. (Aff. of James Richard Spivey, M.D. ¶¶ 5–8; Aff. of Mary Patrice Webster, M.D. ¶¶ 4–7.)

Notwithstanding this evidence, it appears to be the position of Equitable that Dr. Giddens' involvement in real estate was not, in fact, an "occupation," but rather a "mere investment." In support of this position, Equitable points to two letters from Dr. Giddens' attorneys characterizing his real estate involvement as a "side business" and a "passive investment," as well as Dr. Giddens' own sworn testimony before the Social Security Administration that "[r]eal [e]state [d]evelopment was mainly an investment." (*See* Def.'s Mem. of Law in Supp. of Mot. for Summ. J., Exs. 7–10.) In addition, Equitable charges that Dr. Giddens' condition did not actually preclude him from engaging in the duties of a real estate investor, emphasizing the testimony of Dr. Giddens that his duties in that role did not involve any physical labor.

Equitable's argument fails for two reasons. First, it has failed to direct the Court to *any* authority, and the Court has been unable to locate any, holding that an enterprise engaged in for profit cannot constitute one's "regular occupation" when it is subjectively perceived by the insured (or his agents) as an "investment."[8] Further, the only evidence now in the record as it relates to Dr. Giddens' involvement in real estate development shows that his activities went well beyond that of a casual investor who simply places money in a given commodity with hopes of an appreciation in value. Rather, it shows that he had significant administrative duties in connection with that enterprise.

---

**8.** In reaching this result, the Court does not ignore authorities holding that "[a] person's regular occupation is not a business engaged in secondarily to a main profession and it is not a hobby one pursues while engaging in other business." *DiTommaso,* 1991 WL 124601, at *3. Nevertheless, in order to classify Dr. Giddens' real estate development activities as "secondary" to another business, the Court would have to conclude that Dr. Giddens *primary* profession is that of dentistry. Were that to be the case, then Equitable would likewise not be entitled to summary judgment because ample evidence exists suggesting that Dr. Giddens is unable, due to his purported disability, to carry on the substantial functions of a dentist. (Aff. of James Richard Spivey, M.D. ¶¶ 5–6; Aff. of Mary Patrice Webster, M.D. ¶¶ 4–6.)

Second, while placing inordinate emphasis on testimony that Dr. Giddens' engagement in real estate development did not involve *physical* labor, Equitable fails to appreciate the uncontradicted testimony of Dr. Giddens' physicians that his chronic fatigue, depression, anxiety, and short-term memory loss preclude Dr. Giddens from performing even the *administrative* duties attendant to that enterprise. (Aff. of James Richard Spivey, M.D. ¶¶ 4, 7–8.) Thus, the relatively relaxed *physical* demands of Dr. Giddens' real estate endeavor do not foreclose a finding of disability under the relevant Policies.

In sum, insofar as Equitable seeks summary judgment that Dr. Giddens is not entitled to benefits in connection with his 1999 claim, it Motion will be denied.

## D. Bad Faith

Equitable additionally moves the Court for the entry of summary judgment in its favor on the issue of liability under O.C.G.A. § 33–4–6. That statute authorizes the supplemental award of up to fifty percent of the liability of the insurer, plus attorney's fees, when the insurer is found to have refused to make payment under a relevant policy in "bad faith." O.C.G.A. § 33–4–6(a).

 In the context of insurance, bad faith means "any frivolous and unfounded refusal in law or in fact to comply with the demand of the policyholder to pay according to the terms of the policy." *Interstate Life & Accident Ins. Co. v. Williamson*, 220 Ga. 323, 138 S.E.2d 668, 669 (1964) (*quoting Royal Ins. Co. v. Cohen*, 105 Ga.App. 746, 125 S.E.2d 709, 711 (1962)). When the insurer's refusal to pay the claim rests on unsettled areas of the law, or involves bona fide disputes as to the facts supporting the insured's claim, relief under the statute is unavailable. *See Grange Mut. Cas. Co. v. Law*, 223 Ga.App. 748, 479 S.E.2d 357, 359 (1996) ("The jury

was not authorized to award the [insured] bad faith penalties if [the insurer] had any reasonable ground to contest the claim and there were disputed questions of fact."); *U.S. Fid. & Guar. Co. v. Woodward*, 118 Ga.App. 591, 164 S.E.2d 878, 881 (1968) ("[O]ur courts have consistently held that no bad faith exists where there is a doubtful question of law involved. [Cit.] Where the questions of law involved in a case are intricate and difficult of solution, the insurer has the right to contest payment of the claim and is not guilty of bad faith in refusing to pay it."). The insured bears the burden of establishing bad faith. *Interstate Life & Accident Ins. Co.*, 138 S.E.2d at 669.

 In arguing that there is no evidence supporting an award under O.C.G.A. § 33–4–6, Equitable points to its initial and prolonged payment of benefits to Dr. Giddens during its investigation of his claim, and its eventual termination of benefits only after Dr. Giddens failed to respond to inquiries requesting an explanation of how his disability prevented him from engaging in his purported occupations. In response to this argument, Dr. Giddens relies exclusively on the line of persuasive authorities rejecting the "occupational defense" raised by Equitable in this litigation (*i.e.*, that his failure to practice dentistry for some time prior to the onset of his disability foreclosed Dr. Giddens from claiming dentistry was his "regular occupation"), and attempts to justify his failure to respond to Equitable's inquiries as the product of being "baffled and bamboozled" by Equitable's requests for information. (Pl.'s Mem. of Law in Resp. to Def.'s Mot. for Summ. J. at 17–19.)

After consideration of controlling precedent and the parties' arguments, the Court concludes that, based on the facts before Equitable *at the time it terminated Dr. Giddens' benefits*, its decision to do so

cannot be characterized as either frivolous or unreasonable. *See Royal Ins. Co.*, 125 S.E.2d at 712 ("Where it appears from the evidence that the defendant's refusal to pay was justified on the basis of the facts appearing to the defendant at the time of the refusal, bad faith is not shown."). In particular, the undisputed facts demonstrate that when Equitable terminated Dr. Giddens' benefits, the facts known to it justified its conclusion that Dr. Giddens had voluntarily abandoned his profession as a dentist, and had assumed the occupation of a passive real estate investor with no active duties in that role from which he had become disabled.

As it relates to dentistry, Dr. Giddens is correct in observing that certain judicial decisions had rejected the so-called "occupational defense" at the time Equitable terminated his benefits. Nevertheless, no such authorities existed in Georgia, and the authorities reflecting that rejection did not then, and do not now, reflect a historically settled or time-tested rule of policy construction. Indeed, many of the opinions cited by Dr. Giddens rejecting this defense were decided *after* Equitable elected to terminate benefits. The oldest cited decision, *Burriesci*, 255 A.D.2d 993, 679 N.Y.S.2d 778, dated back to only 1998, and contained language that could easily be read as requiring that the insured be separated from his profession for only a short period of time in order for that occupation to remain his *regular* occupation. *See* 679 N.Y.S.2d at 779 (4th Dep't 1998) ("The occupation in which plaintiff was 'regularly engaged' and to which she was attempting to return when she was injured was that of assistant administrator, and defendant may not deny benefits to plaintiff because she was *temporarily unemployed* at the onset of her disability.").

Furthermore, the cases Dr. Giddens cites in support of his position that the "occupational defense" is not viable are sufficiently factually dissimilar to this instant case to have at least permitted Equitable to hold a reasonable expectation that a Georgia court would accept its position in *this* litigation. As explained *supra*, those cases dealt with situations where the unemployed insured either (i) had been rendered *unable* to work in their "regular occupation" in the months or years prior to the disability due to the disability itself, or (ii) had only very recently left their employment at the time the disability arose, with some manifest intention to return to their "regular occupation" prior to the onset of the disability. Here, by contrast, there is considerable evidence supporting the view that Dr. Giddens abandoned dentistry to pursue other interests, and this Court has already determined that if the jury found such abandonment it would lay the foundation for Equitable to prevail on its defense *vis-a-vis* the purported occupation of dentistry.

Moreover, while the evidence *now* before the Court supports the view that Dr. Giddens was engaged in, and is disabled from, the occupation of real estate developer, such evidence was not made available to Equitable, despite its request, when it made the decision to terminate benefits. *See Royal Ins. Co.*, 125 S.E.2d at 712 (focus of inquiry is at time of insurer's decision). To the contrary, the record reveals that most of the evidence available to Equitable when it elected to stop disbursing benefits, including Dr. Giddens' sworn statement before the Social Security Administration, was that his involvement in real estate was that of a "passive invest[or]." (*See* Def.'s Mem. of Law in Supp. of Mot. for Summ. J., Exs. 7 & 9.) In addition, Dr. Giddens has provided no evidence that he responded to Equitable's February 2002 request to supply additional information about his responsibilities in that role, or about how his disability prevented him from carrying out those responsibilities. (Def.'s Mem. of Law in

Supp. of Mot. for Summ. J., Ex. 3 ¶ 7, Tab H.)

Succinctly stated, in light of the overwhelming evidence before Equitable at the time it terminated benefits that Dr. Giddens' sole occupation was that of a "passive" investor in real estate, and his failure to provide additional information about the duties attendant to that occupation, the Court does not find any genuine issue of material fact as to whether Equitable's termination of benefits on this basis was "frivolous" or "unreasonable" when made. As a result, insofar as Equitable seeks summary judgment on Dr. Giddens' bad faith claim, its Motion will be granted.

In sum, Defendant's Motion for Summary Judgment [46–1] is **GRANTED in part and DENIED in part.** It is granted insofar as Equitable seeks a judgment that it is not liable in connection with Dr. Giddens' 1995 claim, his claim under a recurrent disabilities theory, and his claim for bad faith under O.C.G.A. § 33–4–6. It is denied insofar as it seeks a holding that Dr. Giddens is not entitled to benefits with respect to his 1999 claim.

### III. Plaintiff's Motion for Partial Summary Judgment

▋ Dr. Giddens moves the Court for partial summary judgment that he is totally disabled under the Policies, and is entitled to collect benefits thereunder [41–1]. Although Dr. Giddens has not articulated a time frame for which he seeks such benefits, given its holdings above, the Court construes Dr. Giddens' Motion as seeking a determination of liability against Equitable in connection with unpaid benefits *vis-a-vis* his 1999 claim. Based on the reasoning set forth *supra,* the Court is compelled to grant Dr. Giddens' Motion.

Despite any genuine fact issues regarding whether Dr. Giddens could properly claim "dentistry" as his occupation under the Policies, the undisputed evidence before the Court shows that he was engaged in the occupation of real estate development,[9] and that he is now unable to perform a substantial portion of the duties of that occupation by virtue of his disability.

Critically, Equitable has come forward with no evidence contradicting Dr. Giddens' testimony regarding the presence of substantial administrative duties attendant to that occupation. Nor has it pointed the Court to any authorities suggesting that an insured's work in a field of "investment" cannot constitute an "occupation" under an insurance contract. Moreover, Equitable's characterizations of that occupation as "passive" or lacking a *physical* component do not engender genuine issues of material fact as to Dr. Giddens' entitlement to benefits. Even if those characterizations were found to be accurate, Equitable has failed to come forward with any proof to contradict the treating physicians' testimony that Dr. Giddens' chronic fa-

---

9. The only evidence before the Court that could conceivably engender a genuine issue of material fact as to the insured's occupation as a real estate developer is Dr. Giddens' attorney's description of his real estate activities as a "side business." *See* Def.'s Mem. of Law in Supp. of Mot. for Summ. J., Ex. 9; *see also DiTommaso,* 1991 WL 124601, at *3 ("[a] person's regular occupation is not a business engaged in secondarily to a main profession and it is not a hobby one pursues while engaging in other business"). As explained above, however, in order to classify Dr. Gid- dens' real estate development activities as "secondary" to another business, the Court would have to conclude that Dr. Giddens *primary* profession is that of dentistry. Were that to be the case, then Dr. Giddens would likewise be entitled to summary judgment because the uncontroverted evidence before the Court demonstrates that Dr. Giddens is unable to carry on the substantial functions of a dentist. (Aff. of James Richard Spivey, M.D. ¶¶ 5–6; Aff. of Mary Patrice Webster, M.D. ¶¶ 4–6.)

tigue, depression, anxiety, and short-term memory loss preclude him from performing even the administrative duties attendant to that enterprise. (*See* Aff. of James Richard Spivey, M.D. ¶¶ 4, 7–8.).

■ Likewise, Equitable has come forward with no evidence suggesting that Dr. Giddens is able to perform *any* substantial duties involved in the occupation of real estate development. To the contrary, the only evidence of record that directly speaks to this issue is the affidavit testimony of Drs. Spivey and Webster, in which both state that Dr. Giddens "is unable to perform substantial portions of the duties of residential construction management and real estate development...." (Aff. of James Richard Spivey, M.D. ¶ 8; Aff. of Mary Patrice Webster, M.D. ¶ 7.) Under Georgia law, such inability is adequate to establish the insured's total disability within the meaning of the relevant Policies. *See Equicor, Inc. v. Stamey*, 216 Ga.App. 375, 454 S.E.2d 550, 552 (1995) ("[D]isability exists if the condition of the insured prevents him from performing a substantial portion of the duties of his occupation or such other line of work as he might reasonably be expected to follow, considering his education, experience, age, and natural ability.") (*citing Mut. Life Ins. Co. of N.Y. v. Barron*, 198 Ga. 1, 30 S.E.2d 879 (1944)).

Accordingly, Plaintiff's Motion for Partial Summary Judgment [41–1] is hereby **GRANTED.**

## IV. Plaintiff's Motion for Leave of Court to Identify Economist and File Separate Motion for Summary Judgment on Calculation of Damages

Plaintiff lastly moves for leave to identify an economist for the purposes of calculating the reduction of future benefits to present value in accordance with the Consumer Price Index, and to file a separate motion for summary judgment solely on the issue of damages [45–1]. Defendant objects to this request, emphasizing that Plaintiff's motion to identify another expert following the expiration of the thrice extended discovery period is untimely, and stating that, in any event, Plaintiff is not entitled to future damages under Georgia law.

■ After reviewing the parties' papers and the cases cited therein, it appears to the Court that Plaintiff cannot recover *future* disability benefits in this action. Rather, because Equitable's actions constitute a mere breach of the insurance contract, rather than a *repudiation* of the parties' agreement, Georgia law dictates that Plaintiff is entitled to recover only those benefits already accrued under the Policies. *Cont'l Cas. Co. v. Stephenson*, 112 Ga.App. 666, 145 S.E.2d 825, 826–27 (1965). Consequently, insofar as Plaintiff requests leave to identify yet another expert, his motion will be denied.

Nevertheless, in light of this Court's holdings, *supra*, the Court finds that it would serve the interests of judicial efficiency for Plaintiff to submit an additional motion for summary judgment addressing *solely* the issue of damages owing under the Policies.[10] Plaintiff's Motion for Leave of Court to Identify Economist and File Separate Motion for Summary Judgment on Calculation of Damages [45–1] is accordingly **GRANTED in part and DENIED in part.** It is denied with respect to Plaintiff's request to identify an additional expert. It is granted as to Plaintiff's request to file an additional motion for summary judgment addressing the is-

---

10. The parties are encouraged to confer in an effort to reach agreement on the benefits to which Plaintiff would be entitled under the Policies. If the parties can stipulate to an amount, no further motions will be necessary.

sue of damages. Plaintiff is directed to submit such a motion within twenty (20) days from the date this Order is entered, and to comply with all local rules in his submission of such a motion. The parties are admonished to address *only* the issue of damages in their papers.

### Conclusion

The Clerk is **DIRECTED** to remove the parties' Joint Consent Motion for HIPAA Qualified Protective Order [39–1] from the pending motions list. The parties' Consent Motion to Extend Time to Respond to Motions for Summary Judgment [52–1] is **GRANTED nunc pro tunc.** Plaintiff's Request for Leave to Supplement Record and Submit Supplemental Memorandum of Law (filed Oct. 14, 2004) is **GRANTED** [77–1].

Defendant's Motion *in Limine* to Exclude the Affidavit and Testimony of M. Patrice Webster, M.D. [62–1] and Motion *in Limine* to Exclude the Affidavit and Testimony of James R. Spivey, M.D. [63–1] are **DENIED.** Defendant's Motion for Summary Judgment [46–1] is **GRANTED in part and DENIED in part.** It is granted insofar as Defendant seeks a judgment that it is not liable in connection with Plaintiff's 1995 disability claim, his claim under a recurrent disabilities theory, and his claim for bad faith under O.C.G.A. § 33–4–6. It is denied insofar as it seeks a holding that Plaintiff is not entitled to benefits with respect to his 1999 disability claim.

Plaintiff's Motion for Partial Summary Judgment [41–1], seeking a determination that Defendant is liable for unpaid disability benefits in connection with Dr. Giddens' 1999 claim, is **GRANTED.** Plaintiff's Motion for Leave of Court to Identify Economist and File Separate Motion for Summary Judgment on Calculation of Damages [45–1] is **GRANTED in part and DENIED in part.** It is denied with respect to Plaintiff's request to

identify an additional expert. It is granted as to Plaintiff's request to file an additional motion for summary judgment addressing the issue of damages. Plaintiff is directed to submit such a motion within twenty (20) days from the date this Order is entered, and to comply with all local rules in his submission of such a motion.