[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 12, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-10816

_____

D. C. Docket No. 02-02094-CV-RWS-1

DR. ALLEN GIDDENS,

Plaintiff-
Counter-Defendant-
Appellee,

versus

THE EQUITABLE LIFE ASSURANCE
SOCIETY OF THE UNITED STATES,

Defendant-
Counter-Claimant-
Appellant,

STANLEY HOWELL,

Defendant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(April 12, 2006)**

Before CARNES, HULL and PRYOR, Circuit Judges.

HULL, Circuit Judge:

In this diversity case, plaintiff Dr. Allen Giddens ("Giddens") sued defendant The Equitable Life Assurance Society of the United States ("Equitable") for disability benefits under two policies. The district court granted partial summary judgment in favor of Equitable and partial summary judgment in favor of Giddens, concluding that Giddens was entitled to payment under the policies for one of his claims. Equitable appeals the grant of summary judgment to Giddens and the denial of its summary judgment motion.

## I. BACKGROUND

In 1986 and 1988, Equitable issued two disability income insurance policies (the "Policies") to Giddens. The Policies did not require Giddens to be disabled from any occupation but only from his "regular occupation." Specifically, the Policies defined the term "your regular occupation" as "the occupation (or occupations, if more than one) in which you are regularly engaged for gain or profit at the time you become disabled."

The Policies provided for certain benefits to be paid to Giddens in the event of "Total Disability," defined as follows:

> TOTAL DISABILITY means your inability due to injury or sickness
> to engage in the substantial and material duties of your regular

2

occupation. It will not be considered to exist for any time you are not under the regular care and attendance of a doctor.

The Policies each also contained a rider providing additional coverage for "Residual Disability" defined as follows:

RESIDUAL DISABILITY means your inability due to injury or sickness to perform:
(1) one or more of the substantial and material duties of your occupation; or
(2) the substantial and material duties of your occupation for as much time as is usually required to perform them. . . .

This appeal primarily concerns whether Giddens is totally or only partially disabled from his regular occupation. We first review the undisputed evidence.

## A. Giddens's Dental Practice

Giddens practiced general dentistry from 1983 until 1994 in Hawkinsville, Georgia. In 1994, he sold his practice to another dentist and cancelled his dental malpractice liability insurance policies. According to Giddens, it was his intention to open another dental office in Macon, Georgia in a building he had previously acquired. However, Giddens became ill in 1994, and his health did not permit him to open the practice in Macon. Nevertheless, he remained a licensed dentist until December 31, 1999, and continued to subscribe to certain professional journals in the field of dentistry. At some point following the sale of his practice, Giddens applied for a position as a dentist with the State Merit System. Furthermore, Dr.

3

Giddens testified that he continues to perceive his primary profession as that of dentistry, and that it was his intention to open a dental office in Macon until the time he became disabled in 1998.

## B. Giddens's Real Estate Development/Investment

While practicing dentistry and following the sale of his dental practice, Giddens also engaged for profit in real estate development and investment. Giddens and his wife owned two companies, Giddens Construction Co., Inc. and Oak Land & Development Inc., through which Giddens participated in the development of real estate. Through these companies, Giddens bought real estate and developed a subdivision. The record shows that forty-three residential lots were developed and sold by Giddens's companies, and indicates the address of each lot and when each lot was sold. Giddens also developed commercial property and was involved with residential rental properties.

Giddens's principal duties in his real estate business were entrepreneurial, financial, planning, coordinating, and other administrative duties. Although Giddens had a construction company and developed projects, he performed no physical labor on the job sites, but subcontracted out all the physical labor to independent subcontractors. Giddens was able to engage in the real estate business

4

with his wife's assistance until 1998, when his health no longer permitted his doing so.

In an affidavit, Giddens described the "functional requirements and tasks for the occupation of construction management and real estate development" as follows:

> entrepreneurial vision and energy; planning real estate projects; selection of house plans and materials; selection of contractors; supervision of construction superintendent(s); periodic inspection of contractors' work quality; financial management of development and construction projects; supervise compliance with building and other regulatory codes; project scheduling; pay bills; pay contractors; work with banks, government agencies, and financial consultants as needed; calculating the feasibility of projects, reviewing sites, and planning for contingencies; and coordination [of] dealings with realtors and agents.

## C. Giddens's Two Claims

Giddens submitted two claims to Equitable under the Policies, one in February 1995 (the "1995 claim") and one in February 1999 (the "1999 claim"). Giddens's 1995 claim asserted that he was disabled due to pain in his left hip; however, he failed to respond to Equitable's requests for information pursuant to the Policies. As a result, the district court granted Equitable summary judgment as to the 1995 claim. Giddens does not challenge the district court's conclusions on this issue on appeal. Thus, this appeal concerns only his 1999 claim.

In October 1998, Dr. Giddens began suffering from symptoms such as fatigue and abdominal pain. He sought treatment at the Mayo Clinic in Jacksonville, Florida, where Dr. Rolland C. Dickson diagnosed him with cryogenic cirrhosis, a condition of the liver. After being diagnosed, Giddens submitted the 1999 claim, asserting that he was on a waiting list for a liver transplant, was disabled, and was unable to pursue his professions of dentistry and real estate development. In May 1999, Dr. Giddens underwent liver-transplant surgery. Since the transplant, his liver test and renal functions have returned to normal, but Giddens still has numerous health problems.

As to his health problems, Giddens produced testimony and Rule 26 reports of two treating physicians, who both supported Giddens's disability claims.[1] Dr. James Richard Spivey, a gastroenterologist, treated Giddens during his post-transplant recovery at the Mayo Clinic. Dr. Spivey testified that notwithstanding Dr. Giddens's initially positive liver function following the implantation of the allograft, Giddens continues to experience numerous adverse symptoms, including numbness in his fingers, hand tremors, gastrointestinal difficulties, chronic sleep

---

[1]Rule 26 requires that a party provide to other parties the identity of any expert witness who may be used to present evidence at trial. Rule 26 further requires that the party submit a report prepared and signed by the expert witness and containing, among other things, "a complete statement of all opinions to be expressed and the basis and reasons therefor." Fed.R.Civ.P. 26(a)(2)(B).

disturbances and fatigue, anxiety, depression, and short-term memory loss. Dr. Spivey opined that those symptoms were the result of both Giddens's disorder and the effects of his medication. Based on his review of the enumerated "functional requirements and tasks" of dentistry and real estate development discussed above, Dr. Spivey further opined that Giddens "is unable to perform substantial portions of the duties of" a dentist or real estate developer, "or any other employment known to [Dr. Spivey] approximating the same livelihood as [those professions], given his personal circumstances, including his experience, education, and physical and mental capabilities." In his deposition, Dr. Spivey clarified that by "substantial portions" of the duties, he meant most of the duties. Dr. Spivey also explained how Giddens's health conditions and medications could affect cognitive functioning, including entrepreneurial vision, as well as energy and physical capabilities.

Giddens also presented testimony of a second treating physician, Dr. Mary Patrice Webster, who has served as Giddens's psychiatrist since 2000, treating his depression associated with his liver failure, transplant, and complications. Dr. Webster's affidavit presents essentially the same conclusions as that of Dr. Spivey with regard to Giddens's disability. In her deposition, Dr. Webster further testified that, in her opinion, Giddens could not perform the duties of either dentistry or real

7

estate development on a consistent basis. Dr. Webster clarified that in her affidavit, when she said Giddens was unable to perform "substantial portions" of his duties, she meant the "vast majority" of the duties. She further stated: "It could potentially mean all the duties, but my — I tend not to speak in absolutes." Dr. Webster noted that Giddens's primary problems, in her view, were his depression and cognitive problems.

In addition to his doctors' reports and testimony, Giddens also submitted his affidavit stating that he continues to be unable to work as a dentist or real estate developer, as follows:

> Since my liver failure and liver transplant, I have been unable to perform most of the duties of either of my occupations, as a dentist or in residential real estate development. While I am not totally helpless, I am unable to resume either of these occupations, or any work of which I am aware approximating the same livelihood, in keeping with my background, circumstances, and physical and mental capabilities.

## D.      Equitable's Payments

When it received the 1999 claim, Equitable began paying total disability benefits while investigating the claim. After an in-house medical review in August 2000, however, Equitable concluded that there was "no current significant impairment that would preclude [Giddens] from performing most of the duties of his occupational description[,]" and Equitable continued to make benefit payments

8

only pursuant to a reservation of rights.[2]  Equitable disbursed a total of $60,790.98

in benefits to Giddens under the reservation of rights.

In September 2001, Equitable reportedly learned that Giddens had not

actively practiced dentistry for four years before he became disabled and that his

real estate pursuit was essentially "passive" in nature.  Equitable requested

clarification from Giddens.  In March 2002, Equitable terminated the payment of

benefits to Giddens.

### E.    Litigation

In June 2002, Giddens filed suit in state court seeking benefits under the

Policies, plus interest and enhanced damages for bad faith failure to pay pursuant

to O.C.G.A. § 33-4-6.  Equitable filed a counterclaim seeking recovery of the

$60,790.98 paid to Giddens under a reservation of rights.  In July 2002, Equitable

removed the case to federal district court.  After the discovery period expired,

Giddens filed a motion for partial summary judgment and Equitable filed a cross-

motion for summary judgment as to all claims.[3]

---

[2]Equitable never requested nor performed any independent medical evaluation of Giddens.  Rather, it simply reviewed the medical information.

[3]Equitable also filed a motion to exclude the testimony of Giddens's treating physicians, Drs. Spivey and Webster, which the district court denied.  We reject Equitable's arguments on appeal that the district court abused its discretion in admitting his doctors' testimony.  Gen. Elec. Co. v. Joiner, 522 U.S. 136, 143, 118 S. Ct. 512, 517 (1997) (stating that the district court's evidentiary rulings, including Daubert rulings, are reviewed for an abuse of discretion).  Both treating doctors had conducted extensive reviews of Giddens's medical history and interacted

9

On November 1, 2004, the district court entered an order (1) granting summary judgment to Equitable as to all claims except the 1999 claim, and (2) granting Giddens's motion for summary judgment as to the 1999 claim based on his being totally disabled from his real estate occupation. Giddens v. The Equitable Life Assurance Soc'y of United States, 356 F.Supp.2d 1313 (N.D. Ga. 2004). The district court determined that Giddens was engaged in the "regular occupation" of real estate developer at the time he became disabled in 1998 and that Giddens was totally disabled with regard to that occupation. Id. at 1331.

As to dentistry, the district court agreed with Giddens that dentistry could also be considered his "regular occupation," but that fact issues existed as to whether Giddens had permanently abandoned dentistry or only temporarily ceased dentistry due to circumstances beyond his control. Id. at 1327-28. The district court determined that those fact issues, however, did not preclude summary judgment on Giddens's dentistry claim because if Giddens was engaged in his dentistry occupation at the time of his disability, the evidence shows he is unable to perform the substantial and material duties of a dentist and is disabled from that occupation as well. Id. at 1331 n.9.

_____

with him and concluded that he was unable to perform various activities as a result of his medical conditions. While certain other tests were available, the particular evidence in this case shows that the doctors' opinions were sufficiently reliable, without further testing, not only as to Giddens's medical condition but also as to which job tasks he could not perform.

10

Giddens then filed a motion for summary judgment as to damages, which the district court granted in part and denied in part. The district court entered judgment for Giddens in the amount of $442,604.82 for unpaid benefits and interest and $16,165.96 as a refund of premium payments, for a total judgment of $458,770.78. The district court denied relief on Giddens's bad faith claim.

Equitable now appeals the district court's grant of partial summary judgment to Giddens on the 1999 claim and denial of its summary judgment motion as to that claim.[4]

## II. DISCUSSION

We address the issues Equitable raises about Giddens's dentistry occupation and then his real estate occupation.

### A.     Giddens's Dentistry Practice

In the district court and on appeal, Giddens claims he had dual occupations – dentistry and real estate development – and is totally disabled from both. Equitable contends that Giddens had abandoned his dentistry practice years prior to his liver transplant, that as a matter of law dentistry was not his "regular occupation" at the

---

[4]"We review the district court's grant of summary judgment de novo, applying the same legal standards that bound the district court, and viewing all facts and reasonable inferences in the light most favorable to the nonmoving party. Summary judgment is appropriate when 'there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law.'" Cruz v. Publix Super Mkts., Inc., 428 F.3d 1379, 1382 (11th Cir. 2005) (quoting Fed.R.Civ.P. 56(c)) (other quotation marks and citation omitted).

11

time of his disability, and that thus the district court erred in denying Equitable summary judgment on his dentistry claim.

The Policies define "regular occupation" as "the occupation (or occupations, if more than one) in which you are regularly engaged for gain or profit <u>at the time you become disabled</u>," not over the course of the insured's life.  (Emphasis added.)  The ordinary meaning of "regular," as used in this context, is "[c]ustomary, usual, or normal."  American Heritage Dictionary of the English Language (Fourth Ed. 2000) at p.1471.[5]  At the time Giddens became disabled, he had not practiced dentistry in over four years.  We thus readily conclude that Giddens was not "regularly" engaged in dentistry at the time he became disabled, even if he intended to return to dentistry at some point if his health permitted.  Accordingly, the district court erred in denying Equitable summary judgment on the dentistry issue.

**B.     Real Estate Occupation**

This conclusion, however, does not prevent Giddens from recovering benefits if he was totally disabled from his real estate occupation.  In the district court, Equitable asserted that Giddens's real estate endeavor was merely a "passive

---

[5]Under Georgia law, "[t]he words used in the policy are to be given their usual and common significance and are to be construed in their ordinary meaning." <u>Larson v. Georgia Farm Bureau Mut. Ins. Co.</u>, 520 S.E.2d 45, 46 (Ga. Ct. App. 1999) (citation omitted).

investment" and not an occupation. The district court rejected that argument, and concluded that Giddens had a real estate occupation, stating that

> the only evidence now in the record as it relates to Dr. Giddens' involvement in real estate development shows that his activities went well beyond that of a casual investor who simply places money in a given commodity with hopes of an appreciation in value. Rather, it shows that he had significant administrative duties in connection with that enterprise.

Giddens, 356 F.Supp.2d at 1328. The district court also explained that Equitable had failed to cite any authority holding that "an enterprise engaged in for profit cannot constitute one's 'regular occupation' when it is subjectively perceived by the insured (or his agents) as an 'investment.'" Id.

On appeal Equitable does not challenge the district court's determination that Giddens had a real estate occupation and was involved in that occupation at the time of his disability. Rather, in the district court and on appeal Equitable argues (1) that issues of fact exist as to what the substantial and material duties of Giddens's real estate occupation actually were, (2) that the Policies require that Giddens must be unable to perform all of those substantial and material duties in order to be totally disabled, and (3) that Giddens failed to prove he was disabled from all such duties. We turn to those issues.

## C. Substantial and Material Duties of Real Estate Occupation

13

As noted above, the Policies provide that "total disability" means the insured's "inability due to injury or sickness to engage in the substantial and material duties of [the insured's] regular occupation." In his affidavit, Giddens described the "functional requirements and tasks for the occupation of construction management and real estate development" as follows:

> entrepreneurial vision and energy; planning real estate projects; selection of house plans and materials; selection of contractors; supervision of construction superintendent(s); periodic inspection of contractors' work quality; financial management of development and construction projects; supervise compliance with building and other regulatory codes; project scheduling; pay bills; pay contractors; work with banks, government agencies, and financial consultants as needed; calculating the feasibility of projects, reviewing sites, and planning for contingencies; and coordination [of] dealings with realtors and agents.

Giddens, 356 F.Supp.2d at 1318-19. The duties listed in Giddens's affidavit are basically entrepreneurial, financial, planning, coordinating, and administrative duties. Thus, the record showed what Giddens's substantial and material duties were in his real estate occupation.[6]

_____

[6]Equitable stresses that Giddens testified only to the "functional requirements and tasks," and not the substantial and material duties, of his real estate occupation. Equitable in essence argues that Giddens failed to use the correct terminology.

We reject Equitable's argument that there is a factual issue simply because Giddens failed to use the magic words "substantial and material" in his affidavit. The use of the term "functional requirements and tasks" was perhaps inartful; however, it is clear that the point of Giddens's testimony was that the elements listed as "functional requirements and tasks" were in fact the substantial and material duties of his occupation. His testimony, regardless of the terms used, is evidence of the substantial and material duties involved, and Equitable did not introduce any evidence to undermine Giddens's testimony on this point.

14

Because Equitable does not now dispute that Giddens was engaged in the occupation of real estate development, the question we must answer for summary judgment purposes is whether, viewing the evidence in the light most favorable to Equitable, any genuine issue of material fact precludes a finding that Giddens was unable to perform the substantial and material duties of his real estate development occupation. Equitable did not present expert evidence about the substantial and material duties of Giddens's real estate venture. Rather, Equitable primarily asserts that two items in the record contradict Giddens's testimony and create fact issues as to what his real estate duties were. Equitable's brief points to (1) Giddens's representation to the Social Security Administration in his May 1999 Work History Report that the "development work was all '[s]ubcontracted to . . . independent contractors' rather than performed by Giddens himself," and (2) his attorney's representation in a letter, dated September 5, 2001, that the real estate business was "a passive investment . . . managed primarily by his wife." The district court properly rejected this argument.

As for Giddens's representations, in the Social Security report he identified his job title as "Real Estate Development" and listed his rate of pay as $30,000 per

year and his hours as two to five per day, five days per week.[7]  Giddens described

his development job by completing the Social Security report as follows:

Rate of Pay     Per *(Circle One)*                          Hours per day            Days per week
   $30,000         Hour Week Month (<u>Year</u>)                 <u>2-5 hrs a day</u>                    <u>5</u>

In this job, did you:     Use machines, tools or equipment?          Yes (explain below) ☐     No ☑

                        Use technical knowledge or skills?           Yes (explain below) ☑     No ☐

                        Write reports or complete forms?            Yes (explain below) ☑     No ☐

Describe this job.  What did you do all day?  *(If you need more space, write in the "Remarks" section.)*  <u>Developed</u>

<u>Land for Commercial and Residential use.  Subcontracted out all work to independent contractors.</u>

In this job, how many total hours each day did you:

| | | | |
|---|---|---|---|
| Walk? | <u>1 hr.</u> | Kneel? *(Bend legs to rest on knees.)* | <u>0</u> |
| Stand? | <u>0</u> | Crouch? *(Bend legs and back down & forward.)* | <u>0</u> |
| Sit? | <u>1 hr.</u> | Crawl? *(Move on hands & knees.)* | <u>0</u> |
| Climb? | <u>0</u> | Handle, grab or grasp big objects? | <u>0</u> |
| Stoop? *(Bend down and forward at waist.)* | <u>0</u> | Write, type or handle small objects? | <u>2 hrs.</u> |

Lifting and Carrying *(Explain what you lifted, how far you carried it, and how often you did this.)*

<u>did not really lift or carry anything.</u>

On the next page under "Remarks," Giddens stated: "Real Estate

Development was mainly an investment.  We had no employees all work was

subcontracted out."  Giddens also responded "no" to the question of whether he

supervised people in the development job.

---

[7]The record indicates that Giddens's wife actually filled out at least part of the report, but Giddens signed the form and attested to its truth.

16

As for the representations of Giddens's former attorney, Randall P. Harrison, this is what he stated in a September 5, 2001, letter to Equitable:

> The real estate development was a passive investment for [Giddens] that was managed primarily by his wife. It required little physical activity as he did none of the physical work. The real estate development consisted of rental property and development of a subdivision. These investment activities occurred during a period from June, 1985 until October, 1998. As a result of the family relocating, his wife was not able to continue with the management of these investments which resulted in the sale of many of the assets.

During his deposition, Harrison explained that the phrase "passive investment," as used in that letter, means "a real estate investment where you own property but you're not managing it actively from day to day . . . . An example of that is when you have . . . acreage real estate that you're holding for investment purposes."

Harrison relied on Giddens's 1999 Social Security report as well as other communications from Giddens in devising the term "passive investment." Harrison referenced that 1999 report and attached a copy of it to the September 5, 2001, letter. As we have already shown, in the report, Giddens indicated that he did not perform physical work, and he also characterized the occupation as "mainly an investment." Giddens stated in the report, however, that he "developed land for commercial and residential use," and he indicated that he "use[d] technical knowledge or skills" to do so. Giddens also said that he had to "write reports or complete forms" as part of his occupation.

17

Viewing the evidence in the light most favorable to Equitable, there is no evidentiary basis for concluding that the substantial and material duties of Giddens's real estate development occupation included any active management or physical work. Harrison's letter and the 1999 report to the Social Security Administration, however, show that his duties in this "passive investment" required him to use "technical knowledge or skills." Thus, the type of passive investment in real estate development that had been his occupation requires expertise and knowledge in investing. It requires, at a minimum, the business savvy, brain power, and research skills to be able to distinguish a good investment from a bad one. Giddens owned his own real estate company, Oak Land & Development, Inc., and Equitable does not dispute that he was the brain, although not the brawn, behind that operation.

This definition of passive investment is consistent with Giddens's description during his deposition of his duties as including, in part: "entrepreneurial vision and energy; planning real estate projects; selection of house plans and materials; selection of contractors; . . . supervis[ing] compliance with building and other regulatory codes; project scheduling; . . . work[ing] with banks, government agencies, and financial consultants as needed; calculating the

18

feasibility of projects, reviewing sites, and planning for contingencies; and coordinat[ing] dealings with realtors and agents."

Giddens's uncontroverted medical evidence shows that he suffers from a host of physical conditions as well as mental impairments. Dr. Spivey identified Giddens's impairments as including "chronic sleep disturbances which lead to chronic fatigue, poor coping abilities, chronic anxiety and depression, [and] short term memory loss." His medications cause "cognitive problems including short-term memory loss, inability to concentrate or function, inability to sleep, and ongoing depression." Dr. Webster testified in her deposition that in addition to depression, Giddens "has auditory and visual hallucinations" and side effects to his medicine including "forgetfulness and confusion." Equitable did not perform an independent medical evaluation of Giddens. The testimony of Drs. Spivey and Webster stands unrefuted.

The heart of Giddens's claim is that given his cognitive problems and physical ailments, he cannot perform the entrepreneurial, financial, planning, coordinating, and administrative duties of his real estate occupation. Giddens's medical evidence and his doctors' testimony established that he cannot perform most or the majority of those duties and thus cannot engage in his real estate

occupation. We also agree with the district court's following assessment of Equitable's position:

> . . . while placing inordinate emphasis on testimony that Dr. Giddens' engagement in real estate development did not involve *physical* labor, Equitable fails to appreciate the uncontradicted testimony of Dr. Giddens' physicians that his chronic fatigue, depression, anxiety, and short-term memory loss preclude Dr. Giddens from performing even the *administrative* duties attendant to that enterprise.

Giddens, 356 F.Supp.2d at 1329. The doctors testified that Giddens suffers from hallucinations, memory loss, forgetfulness, inability to concentrate and confusion, and Equitable did not present any medical evidence to the contrary. These symptoms obviously result in a diminished intellectual capacity, greatly hindering Giddens's ability to think and reason on a daily basis. As a result, he is no longer able to exercise the "technical knowledge" and "skills" that he identified as job duties in his sworn statement to the Social Security Administration. Accordingly, the district court did not err in this regard.

### D. Total Disability From Real Estate Occupation

While there is a lot of discussion in the briefs about Giddens's duties, it is but a prelude to Equitable's main defense, which is based on the policy language. Equitable argues the Policies require that Giddens be unable to perform <u>all</u> of the substantial and material duties of his real estate occupation in order to be totally disabled. Equitable stresses that Giddens is unable to perform only most or a

20

majority of his substantial, material duties. Equitable contends that if Giddens is able to perform even one of his substantial, material duties, he is not totally disabled, but only partially or residually disabled. Equitable thus contends the district court erred in granting summary judgment in favor of Giddens.[8]

Because this defense is based on the policy language, we first review the Georgia law regarding construction of insurance contracts and then the Policies.[9]

### 1.    Georgia Law

Under Georgia law, the rights of the parties to an insurance policy should not be expanded beyond the terms of the policy. Baldwin v. State Farm Fire & Cas. Co., 590 S.E.2d 206, 208 (Ga. Ct. App. 2003). "In applying the rules of construction to an insurance contract, the test is not what the insurer intended its

---

[8]The district court concluded that this argument was raised for the first time in a reply brief and thus need not be considered. Giddens, 356 F.Supp.2d at 1325 n.7. In any event, the district court rejected the argument on the merits, noting that the evidence established Giddens was unable to perform "substantial portions" of the occupational duties and thus was totally disabled under the Policies. Id. On appeal, Equitable points out that, in fact, it first raised the argument in opposition to Giddens's cross-motion for partial summary judgment, and thus the issue was properly before the district court. Equitable's opposition brief does state that Giddens incorrectly "contends that the policies should be read to mean that he is totally disabled if he is unable to perform 'most,' but not all, of the substantial and material duties of his regular occupation," and that Giddens's "interpretation would render nugatory the terms of the Residual Disability Income riders"and is inconsistent with Georgia case law. (Opposition Brief, R-4-64 pp. 12-17.) Thus, Equitable timely raised the issue.

[9]In diversity cases, the Court is bound by the applicable state law governing the contract, in this case Georgia law. See Clanton v. Inter.Net Global, L.L.C., 435 F.3d 1319, 1323 (11th Cir. 2006).

words to mean, but rather what a reasonable person in the insured's position would understand them to mean." W. Pac. Mut. Ins. Co. v. Davies, 601 S.E.2d 363, 368-69 (Ga. Ct. App. 2004) (quotation marks and citation omitted).

Where the language of the contract is unambiguous and only one reasonable interpretation is possible, the contract must be enforced as written. Sapp v. State Farm Fire & Cas. Co., 486 S.E.2d 71, 73 (Ga. Ct. App. 1997). However, when a policy is ambiguous, or is capable of two reasonable interpretations, it is construed in the light most favorable to the insured and against the insurer. Davies, 601 S.E.2d at 369; Erie Indem. Co. v. Lascala, 424 S.E.2d 820, 821-22 (Ga. Ct. App. 1992). Indeed, "[p]olicies of insurance will be liberally construed in favor of the object to [be] accomplished, and conditions and provisions therein will be strictly construed against the insurer, as they are issued upon printed forms, prepared by experts at the insurer's instance, in the preparation of which the insured has no voice." Davis v. United Am. Life Ins. Co., 111 S.E.2d 488, 492 (Ga. 1959) (quotation marks and citation omitted). Georgia courts instruct that disability provisions should be given a "practical and reasonable" construction and not a "strict and literal" one. John Hancock Mut. Life Ins. Co. v. Poss, 267 S.E.2d 877, 881 (Ga. Ct. App. 1980) (citation omitted).

22

In addition, the interpretation of an insurance policy, including the determination and resolution of ambiguities, is a question of law for the court to decide. O.C.G.A. § 13-2-1; Claussen v. Aetna Cas. & Sur. Co., 888 F.2d 747, 749 (11th Cir. 1989). We now turn to the Policies.

## 2. The Policy Language

As noted earlier, the Policies define "Total Disability" as the inability to "engage in the substantial and material duties of your regular occupation." Giddens's Policies protect him against disability from his own "regular occupation" and do not require that Giddens be disabled from "any" occupation or "comparable" occupations. Thus, we look to the duties of his real estate occupation.

Further, we agree with Equitable that Giddens did not prove that he could not perform all substantial, material duties but rather proved that he could not perform most or the majority of such duties. For example, Giddens testified that he cannot perform "most of the duties" of his real estate occupation and is unable to resume that occupation. Further, Drs. Spivey and Webster testified that he was unable to perform "substantial portions of the duties of" his real estate development. By "substantial portions," Dr. Spivey meant "most" and Dr. Webster meant "the vast majority." Among Giddens's substantial, material duties

23

that he is unable to perform are his application of entrepreneurial vision and energy, higher-level planning of real estate development projects, financial management of development and construction projects, and determining the feasibility of projects. Although Giddens, according to the evidence, perhaps remains able to perform a few duties – including selecting house plans, materials, and contractors – the testimony of Giddens and Drs. Spivey and Webster indicate that he is unable to perform most or the vast majority of the substantial, material duties of real estate development, and thus is totally disabled from his real estate occupation.

Equitable's main argument on appeal is that Giddens must be unable to perform all substantial and material duties of his occupation in order to be totally disabled. The problem for Equitable is that the Total Disability clause in its Policies does not identify what percentage of "the" duties the insured must be unable to perform. The clause does not say "all" substantial and material duties or "most" or any percentage.

Further, the parties have not cited, and we cannot locate, any decision by a Georgia appellate court construing the same language in a disability policy. However, the Eighth Circuit has construed the same language in a disability policy and determined that it is ambiguous. Dowdle v. Nat'l Life Ins. Co., 407 F.3d 967,

970 (8th Cir. 2005) (applying Minnesota law to policy defining total disability as inability "to perform the material and substantial duties of an occupation"and concluding that ambiguity existed because "[t]he policies' definitions of 'total disability' are susceptible to differing interpretations, because the policies do not speak in terms of 'any,' 'all,' 'some,' or 'the most important part' of [the insured's] duties").[10] We agree with the Eighth Circuit that the policy language here is ambiguous. We do not suggest that "all" is an unreasonable interpretation of the policy language, but we do say that "most" or the "majority" of the substantial and material duties is also a reasonable interpretation if an insured is unable to engage in his regular occupation as a result of his inability to perform most or the majority of those duties.

Construing the Policies in favor of Giddens and against Equitable, we conclude Giddens may establish total disability if he cannot engage in his real estate occupation because he is unable to perform most or the vast majority of the substantial and material duties of his occupation. As outlined above, Giddens's

---

[10]In Dowdle, the insured paid an additional premium to obtain an "own occupation" rider to the disability policy, which expanded his protection by defining "occupation" as the occupation of the insured at the time of disability. 407 F.3d at 968. Thus, Dowdle's policy was effectively the same as Giddens's. Further, the Residual Disability definition in Dowdle's policy defined "partial disability" as inability to perform "one or more" of the important daily duties of his occupation, which is similar to Giddens's Policies.

25

evidence established inability to perform most of his important duties and an inability to engage in his real estate occupation.

That Giddens may be able to perform one or more of the substantial and material duties associated with that occupation simply does not preclude a showing of total disability under the terms of the Policies, as Equitable claims. Even if Giddens can perform a few substantial and material duties – including, for example, selecting house plans, materials, and subcontractors – his ability to perform those tasks in isolation still would not allow Giddens to continue in his real estate development occupation because he is unable to perform his entrepreneurial, financial, planning, coordinating, and administrative duties, which were the heart of his real estate occupation. See Dowdle, 407 F.3d at 972 (concluding that surgeon who could no longer stand long enough to perform orthopedic surgery but could conduct office visits, see patients, read x-rays, perform IMEs, interpret data, and promote referrals was totally – not residually – disabled because he could not perform "the most important substantial and material duty").[11]

_____

[11]We recognize that Giddens argues that summary judgment should be upheld in his favor because Equitable failed to present evidence that he could perform even one of the substantial and material duties of his real estate occupation. However, Equitable's position is that the Policies require that Giddens show he is unable to perform all substantial and material duties and that he has not done so because his doctors testified only that he cannot perform the vast majority of his duties and did not say all duties. Equitable did not need to controvert the doctors' testimony because its position is their testimony did not establish total disability under

26

3.      Equitable's Arguments

Equitable argues that Georgia law compels the interpretation that total disability exists only where the insured is unable to perform all of the substantial, material duties of his occupation.  Equitable cites several Georgia cases that it claims compel this definition of "total disability."  See, e.g., Cloer v. Life & Cas. Ins. Co. of Tennessee, 152 S.E.2d 857 (Ga. 1966); Mut. Life Ins. Co. of New York v. Barron, 30 S.E.2d 879 (Ga. 1944); Metro. Life Ins. Co. v. Johnson, 20 S.E.2d 761, 762 (Ga. 1942); Prudential Ins. Co. of Am. v. South, 177 S.E. 499, 502 (Ga. 1934); Cato v. Aetna Life Ins. Co., 138 S.E. 787 (Ga. 1927).

These cases fail to support Equitable's position because the policy language interpreted in those cases was substantially different from the relevant language in this case.  In those cases, the policies defined "total disability" as the inability to perform "any occupation" or "any work."[12]  Here, by contrast, the Policies define

the terms of the Policies.

[12]See, e.g., South, 177 S.E. at 500 ("The policy provided that total disability . . . existed whenever the insured was 'rendered wholly, continuously, and permanently unable to engage in any occupation or perform any work for any kind of compensation of financial value during the remainder of his life.'"); Johnson, 20 S.E.2d at 762 (stating that policy provided for benefits when the insured became "totally and permanently disabled . . . from engaging in any occupation and performing any work for compensation or profit"); Barron, 30 S.E.2d at 880 (stating that insurance policy defined total disability as "any impairment of mind or body which continuously renders it impossible for the insured to follow a gainful occupation"); Cato, 138 S.E. at 790 (stating that disability would be deemed total and permanent if "such disability presumably will during lifetime prevent such employee from pursuing any occupation for wages or profit"); Cloer, 152 S.E.2d at 858 ("The clause in the disability rider . . . reads that the insurer would waive the premiums should the insured 'become totally disabled as the result of bodily injury or

total disability as the inability to perform "the substantial and material duties <u>of</u> <u>your regular occupation</u>," without regard to whether the insured could do other kinds of work.[13] More importantly, <u>none</u> of the policies in these Georgia cases contained the language at issue here – "the substantial and material duties."

If anything, Equitable's cases show how Georgia courts liberally construe disability policies in favor of insureds and strictly against insurers. In the cases Equitable cites, the Georgia courts rejected the insurers' claims that the requirement of inability to perform "any occupation" or "any work" meant any gainful employment. <u>See</u> <u>Barron</u>, 30 S.E.2d at 883; <u>Johnson</u>, 20 S.E.2d at 762; <u>South</u>, 177 S.E. at 501. Instead, the Georgia courts construed the language of inability to perform "any work" or "any occupation," in favor of the insured, to mean inability to perform substantial portions of <u>the insured's ordinary</u> <u>employment</u> or any other employment <u>approximating the insured's same livelihood</u> as he might fairly be expected to follow given his personal circumstances, including his experience, education, physical and mental capacities. <u>See</u> <u>Barron</u>,

_____

disease so as to be wholly prevented thereby from engaging in any occupation or employment for wage or profit.'").

[13]Georgia courts recognize a distinction between "occupational" policies, which provide benefits of the insured is disabled from a particular occupation, versus "non-occupational" disability insurance policies, which provide benefits only if the insured is disabled from any occupation or gainful activity. <u>See</u> <u>Parker v. Prudential Ins. Co. of Am.</u>, 482 S.E.2d 483, 485-86 (Ga. Ct. App. 1997). The Policies in this case are occupational, but the policies in the cases cited by Equitable are non-occupational.

30 S.E.2d at 883; Johnson, 20 S.E.2d at 762; South, 177 S.E. at 501. In doing so,

the Georgia courts stressed that the word "occupation" must "be construed

according to the facts and circumstances of the execution of the contract, including

the objects to be effectuated thereby." South, 177 S.E. at 501; see also Cato, 138

S.E. at 791 (construing total disability language and stating that "[p]olicies of

insurance will be liberally construed in favor of the object to be accomplished, and

provisions therein will be strictly construed against the insurer"). Thus, in these

cases the Georgia courts construed "any" occupation as occupations approximating

the insured's livelihood.[14] The object to be accomplished in Giddens's Policies is

---

[14]Even Equitable's any-occupation cases have language suggesting that total disability does not require that all duties are closed to the insured, but only that "substantially all" of the material duties are closed to the insured. See, e.g., South, 177 S.E. at 502 ("If the insured is so incapacitated that substantially all of the material activities of any [employment approximating the same livelihood as the insured's ordinary employment] are reasonably closed to him, he is totally disabled within the meaning of the policy." (emphasis added)); Johnson, 20 S.E.2d at 764 (stating that "total disability under the policy exists only when the insured is incapacitated to perform substantially all of the duties of his employment"); Barron, 30 S.E.2d at 883 ("Total disability is inability to do substantially all of the material acts necessary to the transaction of the insured's occupation, in substantially his customary and usual manner.") (quoting Cato, 138 S.E. 787); Cloer, 152 S.E.2d at 859 (concluding that the jury charge was correct because it was in line with Johnson, where "this court in a full bench decision clarified the meaning of total disability by stating that 'total disability under the policy exists only when the insured is incapacitated to perform substantially all of the duties of his employment'"); Equicor, Inc. v. Stamey, 454 S.E.2d 550, 552 (Ga. Ct. App. 1995) (stating that under Barron and other precedent, "'total disability' requires only that the insured be unable to perform substantial portions of his ordinary employment or any other employment approximating the same livelihood . . . ."); Travelers Ins. Co. v. Stanley, 160 S.E.2d 876, 878 (Ga. Ct. App. 1968) ("As summarized in the first headnote of the Johnson case, the insured is totally disabled when 'he is so incapacitated that substantially all of the material activities of his employment, or any similar employment, approximating the same livelihood, are reasonably closed to him. Inability of the insured to perform one or more of the substantial duties of such employment, if this be less than substantially all such duties, does not constitute total disability under such a policy.'").

29

total disability coverage if he is unable to perform so many substantial and material duties that his regular occupation is reasonably closed to him. That point is clearly reached in Giddens's case.

Equitable finally argues that total disability must mean the inability to perform all of the material and substantial duties because to interpret the term otherwise would nullify the "Residual Disability" clause. The Policies define "residual" disability as the inability "to perform . . . one or more of the substantial and material duties of [the insured's] occupation." This argument is unpersuasive. Quite obviously, there is a continuum of disability. If the insured is unable to perform only "one or more" of many material occupational duties, then the insured would not be totally disabled. Where the insured, such as Giddens, is unable to perform most or the majority (but not all) of the material duties and thus cannot engage in his regular occupation, the insured nevertheless is totally disabled from his regular occupation, and this interpretation does not nullify the Residual Disability clause.[15] At some point, a line must be drawn where the disability becomes so severe, and affects such a large percentage of the insured's material and substantial duties, that the disability is total rather than residual. The language

---

[15]Indeed, taking Equitable's argument to the logical extreme would nullify the Total Disability clause. Residual Disability, by its definition, includes the inability to perform one or more of the material duties; a literal reading would include a total inability to perform all duties, since all duties are clearly "one or more" duties.

30

of the Residual Disability clause does not suggest where that line should be drawn and certainly does not require that it be drawn only where Equitable suggests. If Equitable means "all" in its Total Disability clause, then Equitable may make that simple change to its policy forms.[16]

## III. CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary judgment in favor of Giddens as to his 1999 disability claim regarding his real estate occupation. We reverse the denial of summary judgment in favor of Equitable as to his 1999 disability claim as to his dentistry occupation.

---

[16]Because Equitable relies so heavily on Metro. Life Ins. Co. v. Johnson, 20 S.E.2d 761 (Ga. 1942), we discuss that case in more detail. In Johnson, the policy provided for benefits when the insured became "totally and permanently disabled . . . from engaging in any occupation and performing any work for compensation or profit." Id. at 762. Johnson concerned different policy terms than Giddens's Policies and does not control. In any event, as noted in footnote 18 supra, Georgia courts read Johnson as we do, and Johnson, if anything, supports Giddens's recovery because the Johnson court twice stated that total disability exists when the insured is unable "to perform substantially all of the duties of his employment." Id. at 764-65.

Equitable nonetheless argues that other language in Johnson establishes the rule that total disability requires inability to perform all duties. We disagree. Johnson does go on to state that "although [the insured] is unable to perform some or even many of the substantially material activities of his employment," he is not totally disabled "so long as [he] has capacity to perform any substantial part of his duties." Id. (emphasis added). At other points, the Johnson court stated that an insured was not totally disabled "if any substantially material activities of the employment remain open to the insured," and that a case of total disability is presented if the insured is unable to perform "any substantial part of his ordinary duties." Id. (emphasis added).

However, Johnson did not indicate that no single duty (even a material and substantial one) could remain open to the insured. That an insured must be unable to perform "any substantial part" of his duties as a whole is significantly different than Equitable's suggested requirement that he be unable to perform each and every substantial duty. Here, Giddens's evidence shows that he is unable to perform "the vast majority" of his substantial and material duties, including the most important duties, and thus he has shown that he is unable to perform "any substantial part of his duties."

31

**AFFIRMED in part, REVERSED in part.**