[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
July 13, 2006
THOMAS K. KAHN
CLERK

No. 06-11110
Non-Argument Calendar

_____

D. C. Docket No. 05-01193-CV-JOF-1

THE AMERICAN CASUALTY COMPANY
OF READING, PENNSYLVANIA,

Plaintiff-Appellant,

versus

MAG MUTUAL INSURANCE COMPANY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(July 13, 2006)**

Before TJOFLAT, MARCUS and WILSON, Circuit Judges.

PER CURIAM:

Plaintiff-Appellant The American Casualty Company of Reading, Pennsylvania ("American Casualty") appeals from the district court's order granting complete summary judgment to Defendant-Appellee MAG Mutual Insurance Company ("MAG") on American Casualty's claims against MAG for reimbursement of sums expended in defending and satisfying a judgment against a mutual insured in a medical malpractice case. We reverse and remand.

## I. BACKGROUND

Since 1995, J. L. Gayton, M.D., P.C. d/b/a Eyesight Associates of Middle Georgia ("Eyesight Associates") has employed Louis M. Schlesinger, O.D. ("Dr. Schlesinger"), as an optometrist. The terms of Dr. Schlesinger's employment contract with Eyesight Associates originally provided that he would receive professional malpractice coverage under Eyesight Associates' malpractice insurance plan. In 1998, however, this language was deleted and replaced with a provision stating that Eyesight Associates would "pay for and carry professional liability insurance insuring Dr. Schlesinger."

In 2000, American Casualty issued an Optometric Protector Plan (the "American Casualty policy") to Dr. Schlesinger, effective from March 30, 2000, to March 30, 2001, with liability limits of $1,000,000 per claim and $3,000,000 in the aggregate. It covers "all amounts up to the limit of liability, which [Dr.

2

Schlesinger] become[s] legally obligated to pay as a result of injury or damage"

caused by "a professional incident arising out of the supplying of or failure to

supply professional services by [Dr. Schlesinger] or anyone for whose professional

acts or omissions [Dr. Schlesinger is] legally responsible." (emphasis omitted).

Among the "Conditions" listed in the American Casualty policy, however, is an

"Other Insurance" provision:

> If you [(i.e., Dr. Schlesinger)] have other insurance which applies to
> the loss, the other insurance must pay first. It is the intent of this
> policy to apply to the amount of loss which is more than the limit of
> liability of the other insurance. We will not pay more than our limit
> of liability.

(emphasis omitted).

In 2001, MAG issued a Physicians and Surgeons Professional Liability

Policy (the "MAG policy") to Eyesight Associates, effective from July 1, 2001, to

July 1, 2002, with liability limits of $1,000,000 per loss and $3,000,000 in the

aggregate. Under the heading "Professional Organization Coverages," the MAG

policy covers "claims for civil damages arising from the providing, or failing to

provide, medical professional services to patients by covered persons for whose

acts [Eyesight Associates] is legally responsible." This coverage is likewise

subject to an "other insurance" provision: "Insurance under this coverage is excess

of and payable only after all other valid insurance and self-insurance limits of

3

coverage have been exhausted paying settlements and judgments." The MAG

policy also includes a Blanket Employee Shared Limits Endorsement (the "Blanket

Employee Endorsement"), which extends coverage to certain medical professional

employees while in the course of their employment and under Eyesight Associates'

supervision. The Blanket Employee Endorsement contains its own "other

insurance" limitation: "This coverage is excess over other valid professional

liability insurance which specifically names an individual or position."[1]

Dawn Weaks was a patient of Eyesight Associates who received treatment

from Dr. Schlesinger and other Eyesight Associates employees. In June of 2002,

Weaks and her husband filed suit in Georgia state court against Eyesight

Associates, Dr. Schlesinger, and two other doctors employed there, alleging

negligence in failing to diagnose and treat Dawn Weaks's eye condition.

Following a jury trial, the state court entered judgment against Dr. Schlesinger and

Eyesight Associates, jointly and severally, in the amount of $750,000. Although

---

[1] In the "General Rules" section of the MAG policy, there is an additional "Other insurance" provision that states:

> A medical practice claim that's covered under this policy may also be covered under other insurance available to you, either with this Company or other companies. Except as otherwise provided by this policy, we'll pay that portion of your loss which the Each Loss Limit of your coverage under this policy is to the total of all limits that apply. But we won't pay more than the limits of your coverage under this policy.

4

MAG defended Eyesight Associates during the litigation, it was American Casualty that satisfied the $750,000 judgment and paid the $76,415.90 in costs for Dr. Schlesinger's defense.

In 2005, American Casualty filed suit against MAG in federal district court, alleging that Dr. Schlesinger had been covered not only by the American Casualty policy but also the MAG policy–and that MAG was therefore obligated to pay a share of the $750,000 judgment and Dr. Schlesinger's defense costs.  Although both policies contained "other insurance" clauses that "attempt[ed] to limit the liability of each to only excess coverage if another insurance policy exists and provides coverage," American Casualty claimed that these provisions were irreconcilable and therefore canceled each other out, resulting in a division of liability among the insurers on a pro rata basis.  In response, MAG claimed that Dr. Schlesinger was not acting within the scope of his employment when he treated Dawn Weaks, and thus was not insured under the MAG policy.  Even if Dr. Schlesinger was insured,  MAG claimed, the policies' "other insurance" clauses were not in direct contradiction, and could be reconciled by treating American Casualty as the primary insurer and MAG as an excess insurer.  As the *Weaks* judgment did not exceed American Casualty's policy limits, MAG argued, MAG owed nothing.  Both parties moved for summary judgment.

After considering the summary judgment evidence, the district court found that Eyesight Associates supervised Dr. Schlesinger such that he was covered under the Blanket Employee Endorsement in the MAG policy. As for the "other insurance" dispute, however, the district court agreed with MAG's argument that its policy should be treated as an excess policy, while American Casualty's policy should be treated as the primary policy. The proper comparison, the court determined, was between American Casualty's "other insurance" clause and the "other insurance" limitation contained in MAG's Blanket Employee Endorsement, not the "other insurance" limitation contained in MAG's Professional Organization Coverages section. According to the Blanket Employee Endorsement, the district court held, coverage kicks in only after the limits of professional liability insurance such as the American Casualty policy have been exhausted. As that did not occur here, the district court explained, MAG owed nothing on behalf of Dr. Schlesinger or Eyesight Associates, which was liable only in the vicarious sense, and therefore treated as one with Dr. Schlesinger for purposes of pro rata contribution. Accordingly, the district granted summary judgment to MAG and denied summary judgment to American Casualty. As a result, the clerk entered a take-nothing judgment against American Casualty, which now appeals.

## II. STANDARD OF REVIEW

We review the district court's ruling on motions for summary judgment de novo, applying the same legal standards that bound the district court. *Nat'l Fire Ins. Co. of Hartford v. Fortune Constr. Co.*, 320 F.3d 1260, 1267 (11th Cir. 2003). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "On a summary judgment motion, the record and all reasonable inferences that can be drawn from it must be viewed in the light most favorable to the non-moving party." *Nat'l Fire Ins. Co. of Hartford*, 320 F.3d at 1267.

## III. DISCUSSION

On appeal, American Casualty contends that the district court erred by applying the "other insurance" clause of the MAG policy while failing to give effect to the "other insurance" clause of the American Casualty policy. In reality, American Casualty argues, the MAG and American Casualty policies are both primary policies that contain "other insurance" clauses of a type known as "excess" clauses.[2] These excess clauses, American Casualty contends, are mutually

---

[2] An "excess" clause "provides that an insurer will pay a loss only after other available primary insurance is exhausted." 1 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance*

7

repugnant, and Georgia law indicates that in such circumstances the insurers share in liability on a pro rata basis. MAG concedes that Georgia law governs this dispute, but maintains that the district court properly treated the Blanket Employee Endorsement as excess coverage–and therefore insufficient to constitute "other insurance" for purposes of triggering the American Casualty policy's "other insurance" clause.

Under Georgia law, "[a]n insurance contract is governed by the ordinary rules of construction and should be construed to ascertain the intention of the parties. In discovering the intent of the parties, the whole instrument should be considered together, along with the surrounding circumstances." *Progressive Preferred Ins. Co. v. Brown*, 413 S.E.2d 430, 431 (Ga. 1992) (internal citations omitted). "[T]he interpretation of an insurance policy, including the determination and resolution of ambiguities, is a question of law for the court to decide." *Giddens v. Equitable Life Assurance Soc'y of the U.S.*, 445 F.3d 1286, 1297 (11th Cir. 2006).

Georgia caselaw indicates that, when two insurance policies covering the

---

§ 219:5 (3d ed. 1999). The other basic types of "other insurance" clauses are the "pro rata" clause and the "escape" clause. *Id.* A pro rata clause "provides that the insurer will pay its share of the loss in the proportion its policy limits relates to the aggregate liability coverage available." *Id.* An escape clause "provides that an insurer is absolved of all liability where other coverage is available." *Id.*

same risk both contain "other insurance" clauses that cannot be reconciled, those clauses cancel each other out and the insurers share in liability pro rata.  *See State Farm Fire & Cas. Co. v. Holton*, 205 S.E.2d 872, 874 (Ga. Ct. App. 1974) ("Where . . . both insurers attempt to limit their liability to excess coverage 'if there is other insurance,' then the clauses are irreconcilable, cancel each other out, and the liability is to be divided equally between them."); *S. Home Ins. Co. v. Willoughby*, 182 S.E.2d 910, 914 (Ga. Ct. App. 1971) ("As the excess and escape clauses here are logically irreconcilable, they cancel one another out and have no more effect than as if they were never written.").  However, the mere fact that two policies contain "excess" clauses–even if the clauses are identical–does not necessarily mean that the clauses are irreconcilable.  For example,

> [t]he risk covered by automobile liability policies is primarily liability arising from use of the automobile described in the policy and the risk is often extended to liability arising from the use of other automobiles. When automobile liability policies issued to the owner and to the driver both cover an injury, and one or both of the policies contains an excess insurance clause pertaining to non-ownership coverage, it is usually held that the policy issued to the owner of the vehicle is the "primary" policy and the insurer issuing it is liable up to the limits of the policy without apportionment.  The policy providing that it shall be excess insurance as to non-ownership coverage is not regarded as collectible until the limit of liability of the primary policy is exhausted.

*Chicago Ins. Co. v. Am. S. Ins. Co.*, 156 S.E.2d 143, 146 (Ga. Ct. App. 1967); *cf. Ga. Mut. Ins. Co. v. S. Gen. Ins. Co.*, 351 S.E.2d 658, 660 (Ga. Ct. App. 1986)

9

(although auto owner's and permissive driver's policies contained identical excess coverage clauses, the clauses were dependent on the non-owner status of the driver, and the excess clause in the owner's policy therefore had no effect).

Here, the district court stated that, if it were "comparing [MAG's] general 'other insurance' clause to American Casualty's clause, it might find that they were identical and irreconcilable. However, Dr. Schlesinger's coverage on the [MAG policy] is only under the Blanket Employee Endorsement. Thus, it is that endorsement's limitation which is the relevant comparator."[3] The district court then reconciled the clauses as follows:

> The court finds that the sensible reading of the [MAG] policy is that it is generally designed to insure Eyesight Associates for medical malpractice claims brought against it. Eyesight Associates and [MAG] then also contracted for an endorsement that allows for coverage of employees of Eyesight Associates, but only after the insurance those employees have individually obtained has been exhausted. The coverage statement in the Blanket Employee Endorsement achieves that result.

Although the district court identified no authority to support this analysis, MAG cites *Greenbriar Shopping Ctr., Inc. v. Lorne Co.*, 310 F. Supp. 303, 307 (N.D. Ga. 1969), *aff'd* 424 F.2d 544 (5th Cir. 1970), arguing that "primary policy excess 'other insurance' clauses and general excess provisions are not conflicting or

---

[3] By MAG's "general 'other insurance' clause," the district court means the excess clause contained in the MAG policy's Professional Organization Coverages section.

10

irreconcilable because excess clauses do not constitute 'other insurance' within primary policies." Unlike the instant case, however, *Greenbriar* involved a conflict between one policy containing an excess clause and another policy containing a pro rata clause, *not* a conflict between two excess clauses. *See id.* ("The reported cases indicate that excess insurance does not constitute 'other insurance' withing the meaning *of a pro rata clause.* Therefore, unless the policy containing the pro rata clause is not sufficient to cover the loss, then the excess insurance does not attach.") (emphasis added); *cf. Garmany v. Mission Ins. Co.,* 785 F.2d 941, 947 n.6 (11th Cir. 1986) ("The general rule is that in cases of overlapping coverage, an 'excess clause' will prevail over a 'pro-rata' clause."); Russ & Segalla, *supra*, § 219:51 ("As a general rule, where an excess clause and a pro rata clause appear in concurrently effective policies, the pro rata clause is disregarded and full effect is given to the excess clause, making the pro rata policy the primary insurance."). Thus, *Greenbriar* does not support MAG's argument or the district court's analysis.

MAG also argues that, notwithstanding the presence of excess clauses in both insurance policies at issue, only MAG's excess clause should be given effect, because the American Casualty policy is the "primary" policy:

> American Casualty fails to recognize the distinction between a primary policy that seeks to become excess in the event of other

11

primary insurance, and a policy which expressly states that, in the event of a stated contingency such as the mutual insured being specifically named in another policy providing coverage for the loss, the policy will operate only as excess insurance. In the latter type, which is representative of [MAG's] excess provision, the insurer never intended to act as a primary insurer.

We disagree, for several reasons. First of all, the American Casualty policy's excess clause does not specifically refer to "other *primary* insurance." It simply states in relevant part that "[i]f you have other insurance which applies to the loss, the other insurance must pay first." (emphasis omitted). Second, the attempt to distinguish the excess clause in the Blanket Employee Endorsement on the basis that it operates upon the "stated contingency" of "the mutual insured being specifically named in another policy providing coverage for the loss," is not persuasive here. The purported "contingency" is nothing more than the existence of other valid professional liability insurance that names an individual or position (as American Casualty's policy does), which is not that different from the contingency inherent in the language of the American Casualty excess clause quoted above: "*If* you have other insurance which applies to this loss . . . ." (emphasis added).

Finally, the very language of the excess clause in the Blanket Employee Endorsement belies MAG's claim that it "never intended to act as a primary insurer" with respect to such coverage. The Blanket Employee Endorsement is not

12

written like umbrella or "true" excess coverage, which expressly provides nothing but excess coverage over and above certain primary coverage. *See Atkinson v. Atkinson*, 326 S.E.2d 206, 214 (Ga. 1985) ("[U]mbrella coverages . . . are regarded as true excess over and above any type of primary coverage, *excess provisions arising in regular policies in any manner*, or escape clauses.") (emphasis added) (citation omitted); *Cincinnati Ins. Co. v. St. Paul Fire & Marine Ins. Co.*, 474 S.E.2d 78, 80 (Ga. Ct. App. 1996) (umbrella liability endorsement provided that insurer would pay "[e]xcess insurance over and above the amounts provided for in *basic policies*" or "damages arising out of claims or legal actions anywhere in the world covered by this endorsement which are either excluded or not covered under *your basic policies*."). To the contrary, the Blanket Employee Endorsement expressly "extends coverage to the medical professional employees described below," but then seeks to become excess "over other valid professional liability insurance which specifically names an individual or position." This is not the language of an umbrella or excess policy, but a primary policy that seeks to become excess in the event of other insurance. *See Atkinson*, 326 S.E.2d at 213-14 (comparing excess policy with primary policy containing an excess clause). Thus, the district court erred in determining that "[MAG's] policy is an 'excess' policy while American Casualty's is a 'primary' policy."

13

Having clarified that this case involves two primary policies, each of which contains a relevant excess clause, we agree with American Casualty that those excess clauses conflict irreconcilably.[4] Each excess clause plainly attempts, in the circumstances of the instant case, to shift primary liability to the "other insurance," that is, the other policy. The MAG policy, via the Blanket Employee Endorsement, constitutes "other insurance" for purposes of triggering the American Casualty excess clause, while the American Casualty policy, which specifically names Dr. Schlesinger and provides professional liability coverage, triggers the Blanket Employee Endorsement excess clause in the MAG policy. *Cf. Willoughby*, 182 S.E.2d at 914; *Bradshaw v. St. Paul Fire & Marine Ins. Co.*, 226 F. Supp. 569, 576 (N.D. Ga. 1964) (although excess provisions in two primary insurances policies were written differently, they were "mutually repugnant" because "[b]oth policies in question provide that if there be other insurance, each shall be responsible only for excess over any other valid and collectible insurance"). Thus, the excess clauses cancel each other out, and pro rata

_____

[4] MAG did not challenge the district court's determination that Dr. Schlesinger was covered under the Blanket Employee Endorsement, or that the endorsement's excess clause was the relevant comparator (as opposed to the Professional Organization Coverages excess clause). Likewise, there was no challenge to the district court's determination that "[w]here there is an 'active' tortfeasor, like Dr. Schlesinger, and a tortfeasor whose liability is based solely on its status as an employer of the 'active' tortfeasor, as Eyesight Associates' is, the active and vicarious tortfeasor are treated as one for purposes of determining contribution." *See St. Paul Fire & Marine Ins. Co. v. MAG Mut. Ins. Co.*, 433 S.E.2d 112, 114 (Ga. Ct. App. 1993). Accordingly, we will not revisit these determinations in this appeal.

14

distribution of liability is warranted. *See Willoughby*, 182 S.E.2d at 914; *Holton*, 205 S.E.2d at 874-75; *Bradshaw*, 226 F. Supp. at 576-77.

## IV. CONCLUSION

The district court erred in determining that the American Casualty policy's excess clause did not conflict with the excess clause contained in the MAG policy's Blanket Employee Endorsement. The two clauses conflict irreconcilably, and both insurers therefore share in liability on a pro rata basis. American Casualty states that, "[b]ecause the policies provide identical $1 million coverage limits . . . liability for the *Weaks* Lawsuit is to be divided equally between MAG and American Casualty." MAG offers no response to this argument, or to American Casualty's conclusion that "American Casualty is entitled to judgment requiring equal proration between MAG and American Casualty of the costs of defense and judgment in the *Weaks* Lawsuit."[5] We therefore see no reason to reach a different resolution. The judgment of the district court is reversed, and the case is remanded for entry of judgment consistent with this opinion.

**REVERSED AND REMANDED.**

---

[5] There is no claim, for example, that such a result would be inconsistent with the pro rata clause contained in the MAG policy's "General Rules" section. *See supra* note 1.

15